EVAN C. BORGES, State Bar No. 128706
 *EBorges@GGTrialLaw.com*
HEEJIN H. HWANG, State Bar No. 349455
 *HHwang@GGTrialLaw.com*
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1700
Costa Mesa, California 92626
Telephone: (949) 383-2800
Facsimile: (949) 383-2801

Attorneys for Defendants Erika Girardi,
Laia Ribatallada, and Michael Minden

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PSAILA,<br><br>       Plaintiff,<br><br>       v.<br><br>ERIKA GIRARDI aka ERIKA JAYNE, AMERICAN EXPRESS COMPANY, ROBERT SAVAGE, KENNETH HENDERSON, STEVE SCARINCE, PETER GRIMM, LAIA RIBATALLADA, MICHAEL MINDEN, and DOES 1 TO 10, Inclusive,<br><br>       Defendants. | Case No. 2:23-cv-07120-MWF (SKx)<br><br>**DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16**<br><br>Filed Concurrently with Defendants' Special Motion to Strike, Declarations of Laia Ribatallada, Michael Minden, and Evan C. Borges and Request for Judicial Notice, and [Proposed] Order<br><br>**Hearing**:<br>Date:    December 18, 2023<br>Time:    10:00 a.m.<br>Crtrm.:  5A<br><br>Action Filed:  August 29, 2023<br>Trial Date:  Not Assigned |

EXHIBIT 6

Case No. 2:23-cv-07120-MWF (SKx)

# DECLARATION OF ERIKA GIRARDI

I, Erika Girardi, declare as follows:

1.     I am a party in the above-entitled action.  The facts stated herein are within my personal knowledge and if called upon to testify, I can truthfully and competently do so as to all matters herein.

## A.     Personal Background

2.     I am an author and entertainer—singer, actress, and dancer.  I am also a business owner.

3.     I was married to Thomas Girardi ("TG") between 2000 and 2020.  TG was more than 30 years my senior and a well-known attorney who showed exterior hallmarks of wealth and financial success.

4.     Throughout our twenty years of marriage, TG exercised complete and exclusive control over our finances, and he did not give me access.  I had no visibility into our finances.  TG's law firm Girardi Keese ("GK") managed our finances.

5.     On November 3, 2020, I filed for divorce from Thomas Girardi.

## B.     2007-2016: Work as an Entertainer

6.     Around 2007, I decided to reignite my singing career.  I began to perform at nightclubs around the country, primarily for an LGBTIQA+ audience.  As part of building my image as "Erika Jayne," I would wear fun, playful, and sparkly outfits for my performances.

7.     Thomas Girardi gave me an American Express ("Amex") credit card during our credit card, including for the purposes of re-starting my singing and performing career.

8.     As with all of our finances, TG did not authorize me to access the credit card account and did not provide me with passwords, credit card statements, or transaction records.  I did not know how much I spent per month or per year.  Girardi Keese paid my Amex credit card bill every month.

-2-     Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

9.    In 2009, I hired Michael Minden, also known as "Mikey," as my choreographer.  Mikey is an accomplished choreographer and dancer.  I worked with Mikey from 2009 to 2013 and have worked with him again from 2014 to the present.  During this time, Mikey became my creative director, which is the role he currently holds.

10.    I first met Laia Ribatallada ("Laia") through Mikey around 2013.  At the time, Laia was working directly for Mikey with his clients, including me.

11.    In August 2015, I started filming for *The Real Housewives of Beverly Hills*, and my work schedule also became busier.  I hired Laia Ribatallada as my assistant around this time to help manage the day-to-day activities.

**C.    Victim of Beverly Hills Credit Card Scam in 2009**

12.    In or around 2009, the United States Secret Service ("Secret Service") contacted me in connection with the investigation of Maria Gabriela Hashemipour (also known as "Gabriela"), an aesthetician based in Beverly Hills suspected of carrying out a credit card scam on her clients.  The Secret Service knew that I had been Gabriela's client and asked to interview me.

13.    Subsequently, I was interviewed by the Secret Service as part of this investigation.  I remember being told during the interview that the Secret Service investigated credit card-related crimes.  This is when I learned that the Secret Service investigated credit card fraud.

**D.    2014-2016: Business Relationship with Marco Marco**

14.    I first met Marco Morante, the designer of Marco Marco LLC ("Marco Marco"), in 2012 through my stylist at the time.  Mikey was also friends with Mr. Morante.

15.    In 2014, Mikey and I discussed having Mr. Morante and his company design my performance costumes.  Marco Marco made bold, playful, and sparkly bodysuits for women, which suited my style.

-3-    Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

16.     Mikey and I also thought that working with Marco Marco would make good budgetary sense.  Before meeting Marco, I had my costumes made by Sylvia's Costumes, a well-known and decades-old costumer based in Hollywood, California.  Sylvia's Costumes was expensive.  Marco Marco was an up-and-coming designer with a much smaller clientele in 2014, and I believed that they would be a lower cost alternative to Sylvia's Costumes.

17.     Throughout this business relationship, I became good friends with Mr. Morante.  I did not know Plaintiff Christopher Psaila ("Mr. Psaila") very well because I usually did not communicate with him directly, but I knew that he was Mr. Morante's business partner, so I trusted him.

18.     Mikey or Laia would communicate with Mr. Morante or Mr. Psaila to place costume orders or discuss design and logistics.

19.     For the duration of our business relationship from 2014 to 2016, I primarily commissioned Marco Marco to create costumes that I would wear for my performances.

20.     I did not instruct Mikey or Laia to order costumes for my backup dancers from Marco Marco, except for one or two special occasions, such as when we shot a music video.  Otherwise, we did not need highly stylized, bespoke costumes for the dancers, and we did not want to spend designer prices on the dancers' costumes.

21.     Until late 2016, I did not suspect Marco Marco of any wrongful conduct.  I continued to trust Marco Marco and praised Marco Marco's designs on my social media.

**D.     Summer and September 2016: TG Complains About Increased Expenses and I Gain Access to My Amex Account**

22.     Sometime in 2016, TG began to complain to me on multiple occasions that I was spending too much on my Amex card.

-4-                                          Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

23. My husband's complaints concerned me. Although I had no visibility into our finances, TG had not otherwise complained about financial problems, nor had he mentioned to me that he or his law firm had needed to take on debt or that they were behind on any outstanding debt obligations.

24. When I asked TG what charges he was referring to, all TG did was mention high dollar amounts with no specifics.

25. About a month later, TG again complained to me again about supposedly high and excessive Amex charges. I asked for specifics but received none.

26. Based on my husband's complaints, I decided to try and get access to my Amex account. In September 2016, I called Amex but could not provide security information because I did not know it. The Amex customer service agent reassured me that she recognized my voice from watching *The Real Housewives of Beverly Hills* and gave me access to the AMEX account.

27. Laia was with me when I made the call to AMEX.

28. Subsequently, on September 19, 2016, I received an email from AMEX confirming my recent enrollment for online access to my account. A true and correct copy of the email from AMEX is attached hereto as **Exhibit 1.**

**F.    September 19, 2016: First Unusual Charge from Marco Marco**

29. On September 18, 2016, I performed in Dallas, Texas at the Dallas Pride Festival. Mikey and Laia accompanied me on this trip, just as with my other performances.

30. On September 19, 2016, I noticed a recent charge by Marco Marco through the AMEX application on my cell phone. I was confused by the charge because I was not aware of any upcoming performances in the next month or two and was not aware of any pending costume orders.

Case No. 2:23-cv-07120-MWF (SKx)
DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

31. As Mikey, Laia, and I departed our hotel in Dallas, Texas and got into a car to head to the airport, I told Mikey and Laia about the recent Marco Marco charge. I asked Mikey to call Chris Psaila to ask about the charge.

32. Mikey called Chris Psaila in the car and talked to him. When the call ended, Mikey reported back that Chris had said the charges were a mistake and would be fixed.

33. I was surprised by the incident because I did not expect Marco Marco to make this kind of mistake. Nonetheless, I accepted Chris at his word because I trusted him and Marco.

34. We were not aware of any other overcharges by Marco Marco at that time, and we believed that this incident was a one-off incident.

35. I did not receive any Amex alerts for charges by Marco Marco for the next two months.

**G.** **November 30, 2016 and December 1, 2016: Additional Amex Alerts and Mr. Psaila's Admission of Unauthorized Charges**

36. On November 30, 2016, I received a mobile notification from Amex for a pending charge of $4,500 to "MARCOMARCOUNDERWE."

37. The next day, on December 1, 2016, I received another alert from the AMEX mobile application, notifying me of a pending charge of $5,000 to "MARCOMARCOUNDERWE."

38. I had received both alerts in the middle of the night.

39. I was alarmed by the charges because I did not have any upcoming shows for the remainder of the year, and I was not aware of placing or authorizing orders for new costumes.

40. On the morning on December 1, 2016, I called Mikey to let him know about the new alerts and pending charges, and I asked Mikey to contact Marco Marco immediately to find out what was going on.

-6-

Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

41. Soon after, Mikey informed me that he had texted Mr. Psaila and that Mr. Psaila had responded by text, stating, "Ok that is very wrong. Wtf is going on!? I'm sorry. I'm calling them now." (Declaration of Michael Minden In Support of Defendants' Special Motion to Strike Plaintiff's Complaint Pursuant to Code of Civil Procedure Section 425.16 ("Minden Declaration"), Ex. 1.)

42. Mikey told me that Mr. Psaila further texted, "They have both been returned and I have instructed them to delete the card they had. Going forward I will reach out to you when it's time to process and I will process myself. I'll have Marco reach out later today with the actual price of the garment as both of those seemed too high." (*Id.*)

43. Mikey further relayed that Mr. Psaila had texted, "I had this same issue with another client a week ago. My apologies. Time for a new bookkeeper." (*Id.*)

44. Mikey told me that he had texted Mr. Psaila to let him know that "Erika is going back through all other Marco charges to make sure there has been no other mistakes previously." (*Id.*)

45. By this point, Mr. Psaila had admitted to three unauthorized charges totaling multiple thousands of dollars on my Amex credit card within a span of two months.

**H. December 1, 2016: Review of Amex Statements and Mr. Psaila's First Set of Invoices**

46. At some point on December 1, 2016, I spoke with Mr. Psaila directly. I do not recall the specific discussion we had, but it would have been about the November 30, 2016 charge and the December 1, 2016 charge.

47. That same day, Laia and I were discussing the two new Marco Marco charges, and we wanted to check whether Chris had actually reversed the charges. I instructed Laia to log in to my online Amex account and to search my statements.

48. Laia showed me a long list of charges to Marco Marco on my Amex account. She explained that she had searched my Amex transactions between 2015

-7-

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

and 2016 using the search term "marco marco" and had found some charges to Marco Marco. She told me that she ran a second search using the term "marco," which resulted in more transactions between 2015 and 2016. Laia told me that the total amount of charges was almost a million dollars.

49. I was shocked when I heard Laia's explanation and saw the list. In my view, there were too many transactions. I had performed in 21 shows in 2015 and 11 or 12 shows in 2016. Yet, there were over 100 transactions in that two-year period.

50. I also believed that the expenses were too high. I did not know how much Marco Marco had charged for each of our costume orders or alteration requests. However, I remembered that Mr. Psaila had said the two Amex charges I had received that day and the day before for $4,500 and $5,000, respectively, "seemed too high." Yet, I saw dozens of charges in 2015 and 2016 that were much higher in amount and ranged from over $5,000 to over $10,000 per transaction.

51. In addition, the Marco Marco transactions on my Amex card amounted to $303,279 in 2015 and $631,240 in 2016, or almost one million dollars total for the two years. I did not understand how Marco Marco could have charged twice as much in 2016 than in 2015.

52. Laia and I noticed that there was not a December 1, 2016 charge on my AMEX statement, but there was still a November 30, 2016 charge, even though Mr. Psaila had represented that "both" charges had "been returned."

53. I was in disbelief and deeply hurt. I could not believe that a friend whom I had trusted and relied on for the past two years had betrayed my trust and taken advantage of my financial situation.

54. At 3:50 p.m. Pacific Standard Time ("PST") on December 1, 2016, Chris emailed me nineteen PDF documents under the subject line "2015 invoices." (Ribatallada Decl., Ex. 5.) Mr. Psaila emailed me again at 4:33 p.m. PST under the subject line "recent 2016." (*Id.*, Ex. 6.) This email had one attachment and a

-8-

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

message stating, "Attached are sales I have downloaded from our credit card processor while I wait on invoices." (*Id.*)

55. I did not review the attached documents in detail. However, I noted that there were only about twenty documents and not enough invoices to account for all of the transactions that Laia had shown me from my Amex account.

56. I forwarded Mr. Psaila's two emails to Laia on December 2, 2016. (*Id.*, Ex. 5 & 6.) Laia shared my view that there were not enough invoices to account for all of the Marco Marco charges on my Amex account.

## I.   Early December 2016: Initial Contact with Secret Service

57. Based on the unauthorized charges on my Amex account and Mr. Psaila's texts to Mikey, I decided to report my concerns to the Secret Service.

58. I knew to contact the Secret Service, and not local law enforcement, because I was told during my interview for the 2009 investigation of my former aesthetician that the Secret Service investigated credit card fraud.

59. I got in touch with Robert Savage, who was the U.S. Secret Service Special Agent in Charge at the time. I had met Mr. Savage once or twice socially and knew he was with the Secret Service.

60. I did not now that TG had agreed to or was representing Mr. Savage at this time. I only learned of any actual, potential, or other attorney-client relationship in February 2023, when the *Los Angeles Times* told me that it planned to run a story on February 9, 2023 regarding the connection between my ex-husband and Mr. Savage in a case against Volkswagen. I did not know of any other actual or potential agreements or transactions between TG and Mr. Savage.

61. I did not discuss my intent to report my credit card issue to the Secret Service with TG before I reached out to the Secret Service. I never asked my husband to contact Mr. Savage on my behalf.

62. Neither Mikey nor Laia was part of my initial conversation with Mr. Savage.

Case No. 2:23-cv-07120-MWF (SKx)
DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

63. Based on my conversation with Mr. Savage, I was able to schedule a meeting with the Secret Service for December 7, 2013.

**J.      December 7, 2016: Meeting with the Secret Service**

64. On December 7, 2016, I, Laia, and Mikey went to meet with the Secret Service at the agency's downtown Los Angeles office.

65. We met with Mr. Savage, who introduced us to the Secret Service agents who would handle the investigation: Kenneth Henderson and Steve Scarince.

66. We reported the circumstances surrounding the multiple unauthorized charges on my Amex credit card, including Mr. Psaila's admissions that the charges were wrong, his statements that other clients had experienced a similar issue, and his blaming of the bookkeeper.

67. The meeting was an informational meeting. We did not discuss taking further action. There was no discussion then of setting up a meeting with Mr. Psaila or my wearing a wire.

**K.      December 8, 2016: Mr. Psaila Admits to More Unauthorized Charges**

68. On December 8, 2016 at 8:37 a.m., Mr. Psaila emailed me, admitting that Marco Marco had made multiple mistaken charges to my Amex credit card. A true and correct copy of his email to me is attached hereto as **Exhibit 2**.

69. This email was sent one week after Mikey had informed Mr. Psaila that I planned to review all of my AMEX charges and after Mr. Psaila had sent me some invoices on December 1, 2016.

70. In the December 8, 2016 email, Mr. Psaila wrote, "Hi Erika, ***I have been going through orders and credit card statements over and over and am clearly seeing mistakes***. I know your schedule is very busy but if you have time coming up I would like to go through and ***come up with a plan to get this sorted***." (Ex. 2 (emphasis added).)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

71. This email was the third time that Chris had admitted to unauthorized credit card charges. At no point did Chris represent to me, Mikey, or Laia that we were mistaken, and he did not give any other reason for the charges.

**L.      December 9, 2016: Review of 2013 and 2014 Amex Statements**

72. On the morning of December 9, 2016, Mr. Scarince from the Secret Service sent me my Amex credit card statements from 2013 and 2014.

73. Laia and I reviewed the two statements and did not find any discrepancies in those charges.

74. I informed Mr. Scarince, Secret Service Agent Blair Brown, and Mr. Henderson that same day that "[w]e've reviewed both years and have found nothing that doesn't make sense. All the crazy charges begin April 2015 till now." A true and correct copy of my email communication from December 9, 2016 is attached hereto as **Exhibit 3**.

75. Later that day, I responded to Mr. Psaila's email from December 8, 2019. I did not respond until after I had reviewed my 2013 and 2014 AMEX statements. I emailed Chris that "I'm available on Wednesday. I can swing by at noon." (Ex. 2 at 1.) I then forwarded the email thread with Mr. Psaila to Mr. Scarince, Mr. Brown, and Mr. Henderson. (*Id.*)

**M.      December 14, 2016: In-Person Meeting with Mr. Psaila**

76. Sometime before my meeting with Mr. Psaila on December 14, 2016, the Secret Service approached me about assisting their investigation by wearing a wire and recording my conversation with Mr. Psaila. I agreed to their request.

77. On December 14, 2016, sometime before noon, I, Laia, and Mikey met with the Secret Service. The agents equipped me with a device that would record our conversation with Mr. Psaila.

78. I, Laia, and Mikey then met with Mr. Psaila at Marco Marco's office. I recall that Mr. Psaila again admitted that there had been mistakes and that Marco Marco had overcharged me by $100k. Mr. Psaila blamed his bookkeeper and said

-11-

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

that this had happened to other clients. Mr. Psaila asked if we could agree to a payment plan through which he would pay back the overcharges.

79. Mr. Psaila's acknowledgment that there had been overcharges and his representations that the bookkeeper was at fault were consistent with what he had previously conveyed to Mikey and me. I had no reason to believe that he would admit to a wrong that had not occurred.

80. Based on Mr. Psaila's statements, I suspected Mr. Psaila of unauthorized credit card charges.

81. Mr. Psaila also handed over a stack of hard copy invoices during this meeting. He said that those were not all of the invoices and that he had to get the other invoices.

**N.** **December 14, 2016: Investigation of All Invoices**

82. After our meeting with Mr. Psaila, Laia and I spent many hours that same day reviewing the invoices from Mr. Psaila and trying to match them to costumes that we had received from Marco Marco. Mikey was not with us, but we called him throughout the day to ask him questions.

83. We checked our emails, text messages, and performance schedule. We took out any costumes from Marco Marco that was in my closet and counted them.

84. We also reviewed by Instagram account. The Instagram account under the username @theprettymess is my Instagram account. I own, maintain, and control this account. The public URL for my Instagram account is www.instagram.com/theprettymess.

85. I regularly post on my Instagram account, including when I have performances. Laia and I reviewed my account to see what I had worn during my shows in 2015 and 2016.

86. Laia attempted to identify legitimate charges, which would be those charges that corresponded to a costume that we knew we had requested for a

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

particular show or performance. Nonlegitimate charges were those for which we could not identify a particular costume or invoice.

87. Based on this review, Laia and I could not account for all of the transactions by Marco Marco on my credit card. When Laia added together the invoice amounts from the invoices that Mr. Psaila gave us, the total amount was around $461,000 in charges for the two years. This number was much less than the almost one million dollars that Marco Marco had charged on my Amex credit card in 2015 and 2016.

88. We were also still missing many invoices. We only had about 73 invoices, but there were 132 transactions by Marco Marco on my Amex card between 2015 and 2016.

89. Some of the invoices from Marco Marco described the costume or service provided. However, Laia and I found that the invoices identified far more costumes than we had in our possession.

90. We shared the results of our review of the invoices with the Secret Service. We also sent screenshots of the December 1, 2016 text messages that Mr. Psaila had sent to Mikey to the Secret Service.

**O.      Contact with Amex About Credit Card Charges**

91. Around this time, I was advised by Mr. Henderson that I should contact American Express's Fraud Department about the Marco Marco credit card charges on my account. Mr. Henderson advised me to tell American Express that I was working with him and Peter Grimm, an American Express Investigator.

92. Mr. Henderson later told me that I should contact Peter Grimm directly.

93. I was unable to get in touch with Peter Grimm until January 2017.

94. I do not recall what documents I shared with Peter Grimm.

95. I do not know when or how American Express provided a refund. I never received any checks directly. I do not know whether I received a credit from American Express in my credit card account.

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

**P. 2017: Events Leading Up to the Grand Jury Indictment of Mr. Psaila on April 28, 2017**

96. On the morning of January 11, 2017, Mr. Henderson informed me that the Secret Service had obtained a search warrant for Marco Marco and would execute it that morning.

97. Prior to this communication, the Secret Service had not contacted me about a search warrant, and I was not aware that the Secret Service was in the process of obtaining a search warrant.

98. I relayed the information from Agent Henderson to Laia and Mikey just so that they were aware of this development.

99. In late April 2017, Mr. Henderson informed me that Assistant United States Attorney ("AUSA") George Pence from the United States Attorney's Office ("USAO") was preparing to criminally charge Mr. Psaila in front of a grand jury and wanted to talk to me. I agreed to speak with Mr. Pence.

100. On April 26, 2017, I spoke with Mr. Pence and Mr. Henderson over the phone. I had not had any prior contact with Mr. Pence or the USAO about the Marco Marco transactions on my Amex credit card.

101. Mr. Pence explained to me that he had identified seven transactions as fraudulent and planned to present these transactions to the grand jury. He generally explained the charges that he planned to bring and how the case would proceed.

102. I do not know how Mr. Pence identified these seven transactions.

103. After the call, Mr. Pence emailed me the seven transactions we had discussed. A true and correct copy of the email communication from Mr. Pence is attached hereto as **Exhibit 4**. In his email, Mr. Pence asked me to review the transactions and to "please call Special Agent Henderson and let him know your thoughts." (Ex. 4.)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

104.  Following Mr. Pence's instructions, Laia and I reviewed the seven transactions and the documents that we had.  Based on our review, we could not determine that the seven charges had been authorized.

105.  I emailed Mr. Pence back that evening, letting him know that "[w]e reviewed these charges and we have no invoices, no emails, and no texts that can support these transactions."  (*Id.*)  I noted, however, "***I would like to speak to you again to make SURE we're not missing anything***."  (*Id.* (emphasis added).)

106.  I wanted to talk to Mr. Pence again out of an abundance of caution.  I understood that a federal criminal prosecution was a serious matter, and I did not want to falsely accuse Mr. Psaila of a crime.

107.  On April 27, 2017, Laia and I spoke on the phone with Mr. Pence and Agent Henderson.  (Compl., Ex. 3.)  Laia and I reiterated that we could not find invoices or documentation supporting the seven transactions that Mr. Pence had identified.  (*Id.*)

108.  Following the call, I did not hear back from Mr. Pence.  I did not receive any direct communications from anyone at the USAO about the case.

109.  Neither Mr. Pence nor anyone from the Secret Service contacted me to let me know that Mr. Psaila had been indicted on April 28, 2017.

110.  I only learned about Mr. Psaila's indictment later on after I reached out to Mr. Henderson for updates on the case.

**Q.    Events Following Grand Jury Indictment and Dismissal**

111.  Between 2017 and 2021, I received intermittent updates from Mr. Henderson about how Mr. Psaila's criminal case was proceeding.  I understood that the case had been delayed.

112.  Neither Mr. Henderson nor anyone from the Secret Service or from the USAO contacted me to let me know that Mr. Psaila's indictment would be dismissed or had been dismissed on September 29, 2021.

Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

113. I learned from Twitter that the criminal case against Chris Psaila had been dismissed after the fact.

114. When I found out about the dismissal, I called Mr. Henderson to ask why Mr. Psaila's criminal case had been dismissed after four years. Mr. Henderson seemed to blame himself. He told me that he had been a new, young agent when he had conducted the investigation of Mr. Psaila and had overlooked certain things.

115. To this day, I do not know why the USAO moved to dismiss Mr. Psaila's indictment.

116. Throughout my interactions with the Secret Service, USAO, and Amex, I did not hold any malice toward Mr. Psaila. I reported the unauthorized credit card charges on my Amex card to the Secret Service and assisted with the federal investigation and prosecution because I genuinely believed that I did not authorize those charges. Similarly, I reported the charges to Amex because I believed, based on the information I had at the time, that I had been overcharged.

117. At no point did I conspire with the Secret Service, USAO, or Amex to fraudulently and maliciously prosecute Mr. Psaila.

118. This experience was difficult and distressing at the time. A friend whom I had trusted had taken advantage of me. I had to confront that friend about his wrongful conduct. As a result, I not only lost a friend but ended an important business relationship.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

-16-

Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 20, 2023.

DocuSigned by:

_____
Erika Girardi

Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF ERIKA GIRARDI IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16