# EXHIBIT 1

## SUPPLEMENTAL DECLARATION OF NICHOLAS R. TROSZAK

I, Nicholas R. Troszak, declare as follows:

1. I am a managing director at Development Specialists, Inc. ("DSI") and have been employed at DSI since 2018. Founded in 1977 DSI is a leading provider of management consulting and financial advisory services, including restructuring advisory services, corporate finance, forensic accounting, litigation support and expert testimony, as well as third-party fiduciary services. Clients include business owners, corporate management and boards of directors, financial services institutions, secured lenders, bondholders, unsecured creditors and creditor committees. As one of the first turnaround firms in the U.S., DSI expanded from its headquarters in Chicago to a national footprint with offices in Los Angeles, New York, Ft. Lauderdale, San Francisco, Wisconsin, Delaware and Ohio to better serve an extensive client base. Over the past 10 years, DSI has been engaged as the financial advisors and/or forensic accountants in several bankruptcy matters, including but not limited to: Woodbridge Group of Companies, *et al.*, Namco Capital Group, Inc., Ezri Namvar, PG&E, and Solyndra, LLC.

2. I am also a Certified Public Accountant and Certified in Financial Forensics (CPA/CFF), and a Certified Insolvency and Restructuring Advisor (CIRA) with over 20 years of experience providing services in bankruptcy, forensic/investigative accounting, and litigation support. Attached as **Exhibit 1** is my curriculum vitae summarizing my more significant bankruptcy related retentions. I have reviewed the contents of this declaration and I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this supplemental declaration in support of the Girardi Keese Trustee's Supplement Brief addressing issues presented by the District Court's remand order.

3. DSI was retained by Elissa D. Miller, the chapter 7 trustee (the "Trustee") for Girard Keese ("Girardi Keese" or the "Debtor"), to, among other things: (i) analyze the Debtor's books and records to investigate the status and values of assets; (ii) reconstruct the Debtor's

-1-

financial transactions[1]; and (iii) assist in the identification of possible causes of action and support of any litigation brought by the Trustee.

4.     During DSI's retention I, along with other DSI accountants, reviewed and analyzed thousands of pages of the Debtor's accounting records and bank statements.  In addition, DSI created a detailed cash receipts and disbursements transactional database for the Debtor's bank accounts for the seven years prior to bankruptcy (the "Cash Database").  DSI reviewed deposit and disbursement information received from banks and reconciled the information to the Debtor's accounting records.  The Cash Database was reconciled to the Debtor's monthly bank statements for the period December 2013 through December 18, 2020 (the "Petition Date").  Based on my experience, bank statements are typically issued on a monthly basis from banking institutions. DSI received and downloaded certain bank account and transactional information from the Debtor's accounting system ("Sage").  The Debtor utilized Sage accounting software to account for their operational day-to-day business transactions.  The Debtor also utilized a MS Access database (also referred to as the Girardi Keese trust accounting system) to account for the trust and Interest on Lawyers Trust Accounts ("IOLTA") bank accounts that maintained the accounting for thousands of Girardi Keese client cases.  The MS Access trust database contained the client portfolio case name and case number associated with each transaction.   Initially, DSI received a download of over 78,000 trust account entries dating back to 1988 from the MS Access trust database ("Trust Database").  Generally, Girardi Keese client case settlement deposits were deposited together into a primary trust account and assigned a case name and case number. Similarly, Girardi Keese client case disbursements were sent from a primary trust account and assigned a case name and case number.

5.     The downloaded information from the Trust Database and Sage served as the initial foundation for the Cash Database (accounting for transactions from 2013-2020).  The Cash Database was then reconciled to bank statements and includes over 300,000 entries (approximately 25,000 trust account entries and approximately 275,000 non-trust account entries)

---

[1]     The reconstruction of financial transactions primarily involved the compilation, reconciliation, and analysis of the Debtor's cash transactions during the seven-year period preceding the bankruptcy filing.

013

for deposits and disbursements from the Debtor's accounts.  DSI reconciled 33 bank accounts (17 trust and 16 non-trust bank accounts) included in the Cash Database.  Based upon this Cash Database, DSI determined that during the seven years prior to the Petition Date, the Debtor deposited and disbursed approximately $600,000,000 from Girardi Keese trust bank accounts and approximately $400,000,000 from Girardi Keese non-trust bank accounts.

6.    DSI's reconciliation of the Cash Database trust bank account transactions established that 23 deposit transactions totaling $1,570,380 (or 0.26% of the total trust account dollars deposited for the seven years preceding bankruptcy), were present in the Trust Database, but did not clear the bank.   Similarly, DSI determined that 477 disbursement transactions totaling $13,886,767 from Girardi Keese Trust Accounts (or 2.31% of the total trust account dollars disbursed for the seven years preceding bankruptcy), were present in the Trust Database, but did not clear the bank.

7.    DSI also added 668 trust deposits to the Cash Database totaling $7,750,109, which represents 1.29% of the total trust deposits, as determined by a review of bank statements, notwithstanding these transactions were not included in the Trust Database.  Similarly, DSI added 668 trust disbursements to the Cash Database totaling $6,815,116, which represents 1.14% of the total trust disbursements, as determined by a review of bank statements, notwithstanding because these transactions were not present in the Trust Database.  Notwithstanding the foregoing the Trust Database was materially accurate from a deposit and disbursement perspective, considering approximately $600,000,000 was deposited and disbursed over the seven years prior to bankruptcy.

8.    The Cash Database serves as the backbone of the forensic cash analysis and has been used for the following significant tasks:

- Assist in verifying claims and supporting the verification and objection process.
- Assist in determining accounts receivable and other Estate assets.
- Assist in identifying and tracing other potential assets of the Debtor not currently identified or quantified.
- Assist in identifying and tracing potential preference and fraudulent transfers to clients,

-3-

trade creditors, lenders and insiders.

- Assist in the preparation of tax returns and dealing with various potential tax claims.

9. DSI analyzed the Trust Database for the entire time period of January 1, 1988, through the Petition Date. DSI summed the receipts and disbursements by case number and case code for this entire period. Attached hereto and incorporated herein by reference is **Exhibit 2**, which is a summary of receipts and disbursements by case number, name and date from the Trust Database. The bottom section of **Exhibit 2**, "Other Cases" are case numbers and case names that are miscellaneous in nature, relate to Thomas Vicent Girardi ("TVG"), personally, or relate to Girardi Keese. For purposes of analyzing actual Girardi Keese client and case activity, the "Other Cases" are being ignored. As illustrated in **Exhibit 2**, depending on the period of time of the transactions and case reviewed, some cases have "net" positive balances, some case have "net" negative balances and other cases have a "net" zero balance. By way of example, as illustrated in **Exhibit 2**, a "net" positive case is 29357 Carson, CA vs Shell Oil in the amount of $25,068,750 **(Exhibit 2, page 45)**. A "net" negative case is 27133 Avandia in the negative amount of -$39,628,081 **(Exhibit 2, page 1)** and a "net" zero case is 20160 Poe vs Firestone in the amount of zero **(Exhibit 2, page 8)**. In theory, as of the Petition Date, there should have been cases with zero balances and cases with "net" positive balances. The "net" positive balances should have equaled the actual cash balance in trust bank accounts; however, they did not. As illustrated in **Exhibit 2**, the balances of the "net" positive cases (money received from the settlement of a case, but not disbursed to the clients) from 1998 through 2020 totaled approximately $161,000,000 as of the Petition Date. However, as s of the Petition Date, the Girardi Keese Trust bank accounts held less than $5,000,000, indicating the Trust bank accounts were out of trust and that proceeds received for the "net" positive cases were not disbursed to the appropriate beneficiaries (*i.e.*, Girardi Keese's clients who were plaintiffs in those cases). Rather, the funds were improperly used for purposes unrelated to the "net" positive cases. As illustrated in **Exhibit 2**, the "net" negative cases (more money was spent on that case than received) equal approximately $176,000,000, indicating these client cases are out of trust. One of the sources of the funds used for the disbursements assigned to the "net" negative cases is from settlement proceeds received for

-4-

the "net" positive cases.  As illustrated in **Exhibit 2**, depending on the time period, many Girardi Keese client accounts are out of trust at any given time period. By way of example, case 27133 Avandia has a negative cash balance of $39,628,081 (**Exhibit 2, page 1**) and case 25198 Bextra/Celebrex has a negative cash balance of $1,851,279 (**Exhibit 2, page 1**).

10.  Further, with one limited exception, DSI determined that the Debtor did not properly segregate the funds in its trust and IOLTA bank accounts.  Rather, the Debtor regularly commingled its client funds in the trust and IOLTA bank accounts.  The intermingling of funds in the trust and IOLTA accounts during the seven years prior to bankruptcy included approximately $10,000,000 of the Debtor's own funds and another approximately $40,000,000 from other sources unrelated to client settlements.  **Exhibit 3** attached hereto contains details of the deposits into trust bank accounts during the seven years prior to the Petition Date.

**DSI's analysis of Debtor's cash transactions preceding the seven years prior to bankruptcy**

11. In order to create a Cash Database for the period preceding the seven years prior to bankruptcy, for example, the period of January 1, 2002 through November 30, 2013 one would need to review and reconcile the Sage and Trust Database to bank statements and other bank support documentation.  In a review of the Debtor's Sage general ledgers for this period, DSI identified 30 non-trust cash general ledger accounts and 12 trust bank accounts in the Trust Database.  If all 30 non-trust bank accounts and 12 trust bank accounts were open for the 12- year period, one would need to reconcile 6,048 (42 bank accounts x 12 monthly statements per year x 12 years) monthly bank statements to the general ledger and Trust Database transactions to create a cash database for the period.

12. During the review of the Trust Database accounting transactions for the period January 1, 2002, through November 30, 2013, DSI noticed commingling and out-of-trust client accounts, similar to the time period of December 1, 2013, through the Petition Date.  During this period (January 1, 2002, through November 30, 2013), the Trust Database contained 27,659 transactions from 12 trust bank accounts, totaling $1,364,036,450 in deposits and $1,342,614,465 in disbursements.  **Exhibit 2** contains a summary by case number and case name.  As illustrated

-5-

in **Exhibit 2**, depending on the period of time, many Girardi Keese client accounts were out of trust at any given time period.  By way of example, as illustrated on **Exhibit 2, page 1**, case 29048 Estate of Mong Qui Sun v DW Tours was negative in the amount of $4,875,000 (Grand Total "net" negative amount of $7,094,900); case 21101 Rezulin was negative in the amount of $2,831,788 (Grand total "net" negative amount of $2,833,663); and, case 25198 Bextra/Celebrex was negative in the amount of $1,233,620 (Grand total "net" negative amount of $1,851,279).

13. During the time period (January 1, 2002, through November 30, 2013), there are 68 total transactions (16 deposits and 52 disbursements) which indicate commingling of personal TVG funds and disbursements of client trust funds for the benefit of TVG.  The transactions are accounted for as associated or relating to TVG under the case number "1001", case name "TVG", or includes TVG within the transaction description.   The Trust Database accounting records indicate 16 deposits totaling $29,680,472 relating to TVG and 52 disbursements totaling $45,079,332 relating to TVG during this period.  Attached hereto as **Exhibit 4** is a listing of these transactions.

14. A specific example of a Girardi Keese case being out of trust is the Rezulin matter, case number 21101.  From the settlements reached in the Rezulin matter, a total of $66,380,270 in deposits were received, and a total of $69,213,933 of disbursements were made and assigned to the Rezulin matter.  All cash transactions for the Rezulin matter occurred between January 1, 2002 through November 30, 2013, except for two transactions totaling $1,825 in disbursements, which took place during 2014.  The disbursements assigned to the Rezulin matter exceeded the deposits assigned to the Rezulin matter by $2,833,663 **(Exhibit 2, page 1)**.  Therefore, the Rezulin matter is out of trust by $2,833,663.  A true and correct copy of the Rezulin Case Card Register printed from the Girardi Keese trust accounting system was provided to opposing counsel and is attached hereto as **Exhibit 5**.  In addition, the register demonstrates transactions which were not related to the Rezulin case such as the check issued on 3/2/2007 to M&M for $750,000 **(Exhibit 5, page 88)**.  This was the money used for the payment of diamond earrings that TVG gave to Erika Girardi.

15. It should be noted that the Rezulin Case Card Register is a separate ledger for the

-6-

017

case and printed from the Girardi Keese trust accounting system.   All but three (totaling approximately $51,000) of the Rezulin transactions occurred from the Girardi Keese IOLTA Comerica Bank account ending in 6674.

16. As stated in my initial declaration in this matter, commingling transactions occurred in the IOLTA Comerica Bank account ending in 6674 during the period April 22, 2002, through December 31, 2010.  A true and correct copy of my initial declaration is attached hereto as **Exhibit 6**.  DSI also determined that the Debtor had numerous client cases that were out of trust during this same period.  A summary of the IOLTA Comerica Bank account ending in 6674 from April 2002 through January 2018 ("Comerica 6674") transactions from the Girardi Keese trust accounting system is attached hereto as **Exhibit 7**[2].  **Exhibit 7** contains a summary of receipts and disbursements by case number and name for Comerica 6674.  The bottom section of **Exhibit 7, page 20**, "Other Cases" are case numbers and case names that are miscellaneous in nature, relate to TVG personally or relate to Girardi Keese.  $17,631,673 was deposited into Comerica 6674 relating to TVG, and $21,479,073 was disbursed from Comerica 6674 relating to TVG (**Exhibit 7, page 20**).  As illustrated in **Exhibit 7**, there are 90 GK client cases that have a "net' negative balance totaling $24,682,028.  For example, the 99140 <u>Friendly Valley</u> matter has a "net" negative balance of $4,429,524 (**Exhibit 7, page 1**).  The "net" negative balance decreases to $4,375,522, when including all other Girardi Keese trust accounts (**Exhibit 2, page 1**).  Also, the 21101 <u>Rezulin</u> matter has a "net" negative balance of $2,782,488 (**Exhibit 7, page 1**).  Both of these examples indicate the "net" negative cases spent more on that case than received in settlement funds, and the funds to make these disbursements had to come from other sources.

17. As described above in paragraph 16, the Comerica 6674 ledger indicates TVG commingled $17,631,673 in deposits into this account and disbursed $21,479,073 relating to TVG. Paragraph 16 also demonstrates that client cases with "net' negative balances utilized funds from other sources to make payments, indicating the client cases with "net" negative balances and client cases with "net" positive balances are out of trust.

---

[2] The transaction ledger for the IOLTA Comerica Bank account ending in 6674 has been produced to opposing counsel and is approximately 760 pages printed and available upon request.  To not unduly burden the record, excerpts of relevant pages are attached hereto as **Exhibit 7.1**.

18. Also present in the Comerica 6674 ledger, between the period from January 30, 2007 (the date the first settlement payment on the Rezulin matter was received) through October 27, 2014 (the date of the last payment attributable to Rezulin), were checks issued to G&L Aviation, an entity owned by TVG and Walter Lack. The total amount paid to G&L Aviation was $2,082,849.59. Two of the four payments are accounted for as relating to TVG and GK miscellaneous. The remaining two payments are accounted for as relating to certain GK client cases. **Exhibit 8** attached hereto contains details of the G&L Aviation payments made from Comerica 6674.

19. In addition, during the period of July 2006 through December 2008, according to the Trust Database, 42 payments from Magnet Consulting Inc. were deposited into Comerica 66674 in the amount of $2,580,000.00. These deposits were accounted for under accounts "10004 Exchange -s/b zero balance" and "10208 MISCELLANEOUS (2008)". **Exhibit 9** attached hereto contains details of the deposits made by Magnet Consulting Inc. into Comerica 6674. According to the Trust Database, during the same approximate time period, and on or around the same dates that the Magnet Consulting Inc. payments were deposited, the Debtor issued 40 checks totaling $2,580,000 payable to Girardi Financial, Inc. for the same amounts (except for the initial payment to Girardi Financial, Inc in the amount of $240,000). These disbursements were accounted for similarly to the Magnet Consulting deposits, under accounts "10004 Exchange -s/b zero balance" and "10208 MISCELLANEOUS (2008)". **Exhibit 10** attached hereto contains details of the Girardi Financial, Inc disbursements.

20. I have previously testified [docket No. 1869] that it will be nearly impossible to conduct a tracing analysis given the high volume of transactions that occurred in the Debtor's accounts pre-dating the seven year period prior to the Petition Date (January 1, 1988 to November 30, 2013). A true and correct copy of my declaration (EFC Doc. # 1869) is attached hereto as **Exhibit 11**. Moreover, many of the transactions in the trust and IOLTA accounts pre-dated the seven year period prior to the Petition Date, and, in my experience, most banks generally do not retain their clients' records for more than seven years; therefore, a fully complete and accurate tracing is likely impossible. Here, the transactions in question took place over 15 years ago. Even

-8-

if the bank account records were obtainable, given the allegations of fraud perpetrated by the Debtor (one allegation is paying itself more fees and costs than were allowed), one would have to review every client agreement from inception through the Petition Date to determine the agreed-upon fee and cost structure for each client of the Debtor.  Once the fee and cost structures are determined, one would need to reconcile what was received in settlement funds, what should have been paid, and what was actually paid for each case.  Then to determine the ultimate source of funds used for a specific disbursement, one could apply an equitable cash tracing method, such as "First In, First Out" ("FIFO"), "Last In, First Out" ("LIFO"), Pro Rata Rule or Lowest Intermediate Balance Rule.

21. Tracing analyses are typically complex and labor-intensive exercises and, thus, are expensive.  Here, because the transactions occurred over the last few decades, the 6,048 monthly non-trust and trust bank statements (42 bank accounts x 12 monthly statements per year x 12 years) are most likely not available, the client agreements are not available, and the costs of applying an equitable cash tracing method, a full and complete analysis will exceed the amount of funds the Trustee seeks to retain (approximately $250,000).  If conducting such an analysis was even possible and using the prior DSI fees incurred to complete the Cash Database as a benchmark, I would estimate the cost to the estate would exceed $750,000.

### Girardi Keese Account Receivable Owed by EJ Global, LLC

22. As of the Petition Date, the Debtor's books and records reflect an asset in the amount of $25,592,261.26 for an account receivable owed from EJ Global, LLC ("EJ Global").  The Debtor's EJ Global receivable account consists of over 13,000 transactions from December 2008 through June 2020.[3]  Generally, the activity in the receivable account is a recordation of cash disbursements made by the Debtor to or for the benefit of EJ Global.  **Exhibit 12** attached hereto contains a summary of the Debtor's cash disbursements, totaled by payee, that were booked to the EJ Global receivable account.  During the approximately 11.5 years that this receivable account was active, only one payment in the amount of $150,000 in October 2019 was made by EJ Global to the Debtor.  The receivable account balance at the time of the EJ Global deposit was

---

[3] The EJ Global account receivable transactions are approximately 183 pages printed and are available upon request.

-9-

approximately $25,562,890.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of August, 2024, at Camarillo, California

_____
Nicholas R. Troszak

-10-

021

Exhibit 6

## DECLARATION OF NICHOLAS R. TROSZAK

I, Nicholas R. Troszak, declare as follows:

1. I am a managing director at Development Specialists, Inc. ("DSI"). I am a Certified Public Accountant. I am also Certified in Financial Forensics (CPA/CFF), and a Certified Insolvency and Restructuring Advisor (CIRA) with over 15 years of experience providing services in bankruptcy, forensic/investigative accounting, and litigation support. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the Girardi Keese Trustee's Opening Brief Addressing Issues Presented by the District Court's Remand Order.

2. The information set forth in this declaration is the result of reviewing and analyzing the Debtor's books and records accounted for contemporaneously and retrieved from the Debtor's office.

3. I have reviewed the Debtor's Trust Account System Activity Register ("Activity Register") for the Comerica Bank trust account ending in 6674, ("Comerica Trust Account" or "CTA"), retrieved from the Debtor's trust accounting system. The Activity Register is one of the accounting methods used by the Debtor in the ordinary course of its business activities. It represents the best available record of the transactions that took place in the Comerica Trust Account during the period of time from March 26, 2002, through January 10, 2018, at which time Girardi Keese ("GK") essentially ceased using the CTA, although it remained open until February 2021. The majority of the transactions in this account occurred between 2002 and December 17, 2013.

4. The Comerica Trust Account was one of GK's primary IOLTA Trust accounts and was not a single purpose trust account. During DSI's construction of its cash database, for December 1, 2013, through the petition date of December 18, 2020, that was used by the Trustee to support her Motion of Consolidation, [Bankr. Dkt. 1787] DSI utilized similar Activity Registers in electronic format to assist in the creation of the cash database. The below information details my review of the Comerica Trust Account Activity Register for the period of time 2002

397

Case 2:21-ap-01155-BR   Doc 194   Filed 08/26/24   Entered 08/26/24 17:08:16   Desc
Main Document    Page 30 of 489

Exhibit 6

through 2010:

5. **Deposits Made into the Comerica Trust Account by Thomas V. Girardi or GK.**  During the time period April 22, 2002, through December 31, 2010, $29,131,673.47 was deposited into the Comerica Trust Account that were credited as deposits made by Thomas V. Girardi ("TVG"), or as a TVG loan, or accounted for under the case number of 10001, case name TVG.  See Exhibit 1.

6. **Payments Made Out of the Comerica Trust Account to Thomas V. Girardi or GK.**  During the same time period (April 22, 2002, through December 31, 2010), $31,579,332.25 was disbursed from the Comerica Trust Account described as payments made to TVG, TVG loan, or accounted for under the case number of 10001, case name TVG.  See Exhibit 1.

The payments in and payments out differential is a negative $ 2,447,658.78.   To be clear, according to this ledger, TVG/GK took almost $2.5 million out of the Comerica Trust Account, more than it put in during this specified period of time.  None of the transactions in this calculation were described as a payment for fees or costs.

7. **Comerica Trust Account Payments to G &L Aviation.**  G & L Aviation was a partnership between Thomas V. Girardi and Walter J. Lack.  See Declaration of Walter Johns Lack, Trustee's Request for Judicial Notice, Exhibit 2.  During the time period of April 22, 2002, through December 31, 2010, $2,082,849.59 in payments were made to G & L Aviation.  See Exhibit 3.

8. **The Pac Ten Payment.**  On June 22, 2006, a check was issued against the Comerica Trust Account payable to Pac Ten Scott Road Associates, LLC, in the amount of $3,200,000.00.  See Exhibit 3.  There was no description of the payment. Mr. Girardi's Financial Statement, December 2017, sets forth as a real estate asset "Pac Ten Partners - 45% interest".  See Exhibit 4 attached hereto.

9. **The Diamond Earrings Payment**.  On March 2, 2007, a check was drawn against the Comerica Trust Account payable to M&M in the amount of $750,000.  The description for the check, "Costs" relating to GK case name *Rezulin,* case number 21101.  See Exhibit 3.

10. **The *Rezulin* Settlement Payment.**  The *Rezulin* case settlement proceeds in the

Exhibit 6

amount of $64,845,728.14 were deposited into the Comerica Trust Account on or around January 30, 2007. There are a number of other deposits made into the Comerica Trust Account that represented settlement funds from other GK cases. See Exhibit 5.

11. A chart of the foregoing transactions is set forth below:

| Case | Date | Type | Payee / Payor Name | Amount | Description |
|------|------|------|--------------------|--------|-------------|
| 10001 | 10/16/02 | Deposit | US Bank | 954.48 | Close Bank Account TVG or David A. Prestholt |
| 10001 | 10/16/02 | Deposit | US Bank | 4,148.76 | Close US Bank Account G&K |
| 10001 | 10/16/02 | Deposit | US Bank | 29,123.35 | Close US Bank Account TVG |
| 10001 | 09/23/04 | Check | GIRARDI & KEESE | (500,000.00) | LOAN FROM TVG |
| 10001 | 09/23/04 | Deposit | COMERICA BANK | 1,500,000.00 | TVG LOAN PROCEEDS |
| 10001 | 10/22/04 | Check | GIRARDI & KEESE | (250,000.00) | loan from TVG |
| 10001 | 10/27/04 | Check | GIRARDI & KEESE | (250,000.00) | loan from TVG |
| 10001 | 11/15/04 | Check | GIRARDI & KEESE | (500,000.00) | loan from TVG |
| 10001 | 11/19/04 | Check | RAMON DESAGE | (198,000.00) | Costs |
| 10001 | 01/20/05 | Deposit | Thomas V. Girardi | 347,446.88 | TVG loan proceeds |
| 10001 | 01/26/05 | Check | GIRARDI & KEESE | (200,000.00) | loan from TVG |
| 10001 | 01/26/05 | Check | Thomas V. Girardi | (147,446.88) | LOAN |
| 10001 | 01/28/05 | Check | GIRARDI & KEESE | (500,000.00) | TVG loan proceeds |
| 10001 | 01/28/05 | Deposit | Thomas V. Girardi | 1,000,000.00 | loan |
| 10001 | 02/11/05 | Check | GIRARDI & KEESE | (500,000.00) | TVG loan proceeds |
| 10001 | 02/11/05 | Deposit | Thomas V. Girardi | 750,000.00 | LOAN |
| 10001 | 02/22/05 | Check | Thomas V. Girardi | (68,121.00) | loan |
| 10000 | 04/26/05 | Check | G&L AVIATION | (500,000.00) | Fees - wire transfer orig coded to 22194 |
| 10001 | 07/27/05 | Adj | GIRARDI & KEESE | (30,000.00) | transfer to 10205 for the Est of Mary Bennett |
| 10001 | 04/25/06 | Deposit | GIRARDI & KEESE | 14,000,000.00 | transfer from 94298 |
| 10001 | 04/25/06 | Check | COMERICA | (14,000,000.00) | . |
| 10001 | 06/22/06 | Check | G & L Aviation | (750,000.00) | . |
| 10001 | 06/22/06 | Check | Pac Ten   Scott Road Associates LLC | (3,200,000.00) | . |
| 10001 | 07/18/06 | Check | HUDNALL, COHN & ABRAMS | (200,000.00) | . |
| 21101 | 03/02/07 | Check | M&M | (750,000.00) | Costs |
| 23150 | 03/12/09 | Check | G & L Aviation | (650,000.00) | Assoc Counsel Fees |
| 10209 | 10/09/09 | Deposit | TERRA COASTAL ESCROW, INC. | 5,844,740.63 | TVG |
| 10209 | 10/15/09 | Check | UNITED STATES TREASURY | (1,500,000.00) | TVG Disb |
| 10209 | 10/15/09 | Deposit | WELLS FARGO ADVISORS, LLC | 500,000.00 | TVG |
| 10209 | 10/16/09 | Check | KELCO PROPERTIES LLC | (2,500,000.00) | TVG Disb |
| 10209 | 11/06/09 | Check | FRANCHISE TAX BOARD | (500,000.00) | TVG Disb 1106622649 , 1101731097 |
| 10209 | 11/10/09 | Deposit | COMERICA | 5,000,000.00 | TVG |
| 10209 | 11/13/09 | Check | GIRARDI & KEESE | (1,000,000.00) | TVG LOAN |
| 10209 | 11/16/09 | Check | GIRARDI & KEESE | (1,000,000.00) | TVG loan |
| 10209 | 11/17/09 | Deposit | GIRARDI & KEESE | 155,259.37 | TVG LOAN |
| 20060 | 11/17/09 | Check | GIRARDI & KEESE | (155,259.37) | TVG |
| 10209 | 12/11/09 | Check | GIRARDI & KEESE | (1,000,000.00) | TVG Loan |
| 10209 | 12/22/09 | Check | KELCO PROPERTIES LLC | (1,135,000.00) | TVG Disb |
| 10209 | 12/24/09 | Check | GIRARDI & KEESE | (1,000,000.00) | TVG Loan |
| 10209 | 12/29/09 | Check | GIRARDI & KEESE | (1,000,000.00) | TVG Loan |
| 21239 | 01/13/10 | Check | G & L Aviation | (182,849.59) | . |
| 10209 | 01/26/10 | Check | GIRARDI & KEESE | (1,000,000.00) | TVG Loan |
| 10209 | 03/23/10 | Check | GIRARDI & KEESE | (1,000,000.00) | TVG LOAN |
| 10209 | 05/10/10 | Check | GIRARDI & KEESE | (250,000.00) | TVG Loan |
| 10209 | 05/13/10 | Check | GIRARDI & KEESE | (250,000.00) | TVG Loan |

399

Exhibit 6

| 10209 | 07/22/10 | Check | GIRARDI & KEESE | (500,000.00) | TVG Loan |
| 10209 | 08/09/10 | Check | SHAWN MCCANN | (200,000.00) | TVG Disb Girardi Funds |
| 10209 | 08/10/10 | Check | Robert W. Finnerty | (60,000.00) | TVG Disb Girardi Funds |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of October, 2023, at Camarillo, California

Nicholas R. Troszak

-4-