LARRY W. GABRIEL [SBN 68329]
*lgabrielaw@outlook.com*
JENKINS MULLIGAN & GABRIEL LLP
5743 Corsa Avenue, Suite 110
Westlake Village, California 91361
Telephone: (818) 943-8992

BRUCE BERNARD BEALKE
[IL.SBN 6200543] (*pro hac vice*)
*Bealkelaw@protonmail.com*
77 W Wacker Dr., Suite 45001
Chicago IL 60601
Telephone: (310) 562-6856

Attorneys for Plaintiff LHA Land, LLC

EVAN C. BORGES, State Bar No. 128706
*EBorges@GGTrialLaw.com*
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1700
Costa Mesa, California 92626
Telephone: (949) 383-2800
Facsimile:    (949) 383-2801

Attorneys for Defendants Erika Girardi, EJ Global, LLC, and Pretty Mess, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LHA LAND, LLC, a Colorado limited liability company, as successor-in-interest to and assignee of Elissa D. Miller, Chapter 7 Trustee of Bankruptcy Debtor Girardi Keese,<br><br>Plaintiff,<br><br>v.<br><br>ERIKA N. GIRARDI, an individual; EJ GLOBAL, LLC, a limited liability company; and PRETTY MESS, INC., a corporation,<br><br>Defendants. | Case No. 2:25-cv-01038-AH<br><br>**JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER**<br><br>**Final Pre-Trial Conference [L.R. 16]**<br>Date:        May 21, 2026<br>Time:        1:30 p.m.<br><br>Trial Date:    May 26, 2026<br><br>**Judge:  Hon. Anne Hwang**<br><br>Place:  Courtroom 9C, 9th Floor<br>        United States District Court<br>        350 W. 1st Street<br>        Los Angeles, CA 90012 |

Following pretrial proceedings, pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16, IT IS HEREBY ORDERED:

## I.   THE PARTIES AND PLEADINGS

### A. The Parties

1.   **Plaintiff**.  Plaintiff LHA Land, LLC, a Colorado limited liability company ("**Plaintiff**"), in its capacity as successor-in-interest to and assignee of Elissa D. Miller, chapter 7 trustee (the "**Trustee**") of bankruptcy debtor Girardi Keese ("**GK**"), has substituted into this action as plaintiff in place and stead of the Trustee pursuant to this Court's Order of May 5, 2026 (Dkt. #100).

2.   **Defendant Erika Girardi**.  Defendant Erika N. Girardi ("**Erika**") is an individual who resides and has conducted business within the jurisdiction of this Court.

3.   **Defendant EG Global LLC**.  Defendant EJ Global, LLC ("**EJ Global LLC**") is a California limited liability company formed in 2008.

4.   **Defendant Pretty Mess, Inc**. Defendant Pretty Mess, Inc. ("**PMI**") is a California corporation formed and organized by Erika in January 2021.

5.   Erika, EJ Global LLC and PMI are hereinafter referred to collectively as "**Defendants**."  Plaintiff and Defendants are hereinafter referred to collectively as the "**Parties**."

### B. The Pleadings

The operative pleadings of the Parties that frame the issues in dispute at trial are the Trustee's *First Amended Complaint* filed on August 26, 2021 (Bankruptcy Dkt. # 12) (the "**FAC**"), and Defendants' *Answer to First Amended Complaint, Affirmative Defenses and Demand for Jury Trial* filed on November 11, 2021 (Bankruptcy Dkt. # 20) (the "**Answer to FAC**").

The FAC contains fifteen causes of action or claims.  Plaintiff has withdrawn and is no longer pursuing the following four claims in the FAC:  for Declaratory

Relief and Turnover of Property of the Estate (First, Second and Third Claims) and for Accounting (Fifteenth Claim).

The remaining eleven claims in the FAC as to which Plaintiff is proceeding to trial include nine claims for decision by the jury and two claims for decision by the Court:

- The nine claims for decision by the jury are the claims for:  (i) avoidance and recovery of intentional fraudulent transfers and constructive fraudulent transfers (Fourth, Fifth, Sixth, Seventh, and Eighth Claims) (the "**Fraudulent Transfer Claims**"); (ii) a state law tort claim for conversion (Ninth Claim) (the "**Conversion Claim**"); and (iii) state law common count claims based upon an alleged debtor-creditor relationship for account stated, open book account, and money had and received (Eleventh, Twelfth, and Thirteenth Claims) (the "**Common Count Claims**").

- The two claims for decision by the Court include:  equitable claims for constructive trust and unjust enrichment (Tenth and Fourteenth Claims) (the "**Equitable Claims**").

In addition to the above claims, the FAC alleges that EJ Global, LLC and PMI were and are alter-egos of Erika.  The Parties discuss these claims in section VIII.5. below.

**Defendants' Defenses at Trial**.  As elaborated in section VI. below, with some exceptions, Defendants' principal defenses at trial to Plaintiff's above-referenced claims are not "affirmative defenses" as to which Defendants bear the burden of proof, but rather, defenses based upon Defendants' contention that Plaintiff cannot meet or has not met Plaintiff's burden of proof to establish by a preponderance of the evidence facts supporting all the necessary elements of Plaintiff's claims.

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

## II.  JURISDICTION

On April 24, 2026, Defendants filed an *Ex Parte* Application (Dkt. # 84) requesting issuance of, *inter alia*, an Order to Show Cause for Plaintiff to show why, after a then-proposed sale and assignment transaction (the "**Sale and Assignment**"), federal jurisdiction exists over this action, and/or why the Court should not exercise its discretion to stop expending additional federal resources on this action and dismiss the case without prejudice, thereby allowing Plaintiff to re-file this action (which Defendants contend currently asserts principally if not exclusively in substance state law claims between private parties with no nexus to the GK bankruptcy estate) in state court.

In opposing the Ex Parte Application, the Trustee asserted that based upon the Sale and Assignment to LHA Land, LLC, a Colorado LLC, diversity jurisdiction exists over this action.  (Dkt. # 87 at 3, ¶ 7).

At a hearing on April 30, 2026, the Court denied the *Ex Parte* Application and commented that if federal jurisdiction existed over this action when it was filed, it appeared to the Court that such jurisdiction would remain in effect.  The Court requested that Plaintiff and Defendants file additional briefs addressing the issue of federal jurisdiction.

On May 4, 2026, the Parties filed a Stipulation to which Plaintiff attached information about the citizenship of the sole member of LHA Land, LLC (Dkt. # 96).  On May 5, 2026, Defendants filed a *Declaration of Evan C. Borges* (Dkt. #99), (the "**Borges Declaration**"), which addressed federal jurisdiction issues at paragraphs 6 –10.

Plaintiff's position is that federal jurisdiction exists over this action, based upon federal question jurisdiction, diversity jurisdiction, or both.

Defendants dispute that diversity jurisdiction may be created over an action such as this one, in which when filed diversity jurisdiction did not exist, by the vehicle

of assignment of claims and substitution of a new plaintiff. *See* Borges Declaration at ¶ 7. Defendants reserve the right to raise with the Court by future motion or otherwise that federal jurisdiction does not exist over this action after the Sale and Assignment transaction, and/or that if it is a matter of discretion for the Court, the Court should abstain from exercising jurisdiction and/or exercise its discretion in favor of dismissing this action, without prejudice to Plaintiff to re-filing its claims in state court. Plaintiff rejects Defendants' assertion, and believes the Court previously decided this issue.

The Parties agree that, if federal jurisdiction exists over this action, venue is proper in this Court.

## III.   TRIAL DURATION

The trial is estimated to take seven (7) to ten (10) days.

## IV.   JURY TRIAL

The trial is to be a jury trial, except for two of Plaintiff's claims: for constructive trust (Tenth Claim) and for unjust enrichment (Fourteenth Claim).

The Parties' joint jury instructions and verdict forms, along with identification of disputed jury instructions and verdict forms and briefs on the disputed jury instructions and verdict forms, will be filed separately.

## V.   ADMITTED FACTS AND STIPULATED FACTS

After meeting and conferring, the Parties have been unable to agree on admitted facts and stipulated facts. Nonetheless, the Parties have agreed that with respect to Plaintiff's FAC and Defendants' Answer to FAC in this action, and Defendants have agreed that with respect to a Declaration filed on October 20, 2023 on behalf of Erika in a separate action titled *Declaration of Erika Girardi in Support of Defendants' Special Motion to Strike Plaintiff's Complaint Pursuant To Code of Civil Procedure Section 425.16* (filed in *Christopher Psaila v. Erika Girardi, et al*. (Central District case no. 2:23-cv-07120-MWF (SKx). These documents contain admissions of

Plaintiff, Defendants and Erika, respectively, and are admissible into evidence without prejudice to the right of Plaintiff, Defendants, or Erika, as applicable and as they deem necessary in their sole discretion, to explain the circumstances of or provide any correction, revision, modification, or addition to any such admission, as they may deem necessary at the trial of this action or otherwise.

## VI.   DEFENDANTS' CONTENTIONS OF FACT

Defendants contend that the below facts are accurate and common to Plaintiff's claims and Defendants' defenses going to trial.  Plaintiff objects to and disputes many of the below-described alleged facts including as stated by Defendants.  As a result, the Parties agreed to include in this section and the next section of this Joint Final Pretrial Conference [Proposed] Order their respective factual contentions common to all causes of action going to trial.

a.   **Defendants Factual Contentions Related to Erika**.  Erika is the estranged spouse of Thomas Girardi ("TG"), whom she married in 2000.  At the time of the marriage, Erika was 28 years old and TG was 61 years old - a 33 year difference.  At the time, TG was already an established attorney and managed and controlled GK.  While Erika does not have personal knowledge of the legal ownership of GK, the Trustee has alleged that at all times relevant to this action, TG was the 100% owner of GK, a fact that Erika has no reason to dispute.

During the marriage, at TG's insistence, TG and GK handled all the married couple's finances, including filing tax returns married filing jointly, which were prepared by TG, GK accounting personnel, and outside accountants retained by TG and/or GK.  Also during the marriage, TG provided to Erika an American Express card for her use.  The account holder on the American Express card and person responsible for payment to American Express was TG.  Erika did not have an independent personal legal obligation to pay American Express for charges on the American Express card TG provided her on which he was the account holder.  In

addition, at no time did any of TG, GK, or American Express contend that Erika was personally liable for charges on any American Express card or cards provided to Erika by TG for her use.

Erika has a 12th grade education.  She always has worked and aspired to work as an entertainer, including without limitation singing, songwriting, and dancing, the most notable being Erika acting in the lead role in the Broadway musical Chicago on two separate occasions (2019-2020 and 2025).  In addition, along with a co-writer, in 2018, Erika published a book titled Pretty Mess, which for a period of time was on the New York Times bestseller list.  Further, for a period of years between approximately 2008 through 2016 and later, Erika performed a singing and dance entertainment show at nightclubs throughout the United States.  Since 2015, Erika also has worked as a cast member on the reality television program called Real Housewives of Beverly Hills.  During her marriage to TG, consistent with TG and GK managing the married couple's finances, Erika also provided to TG (or to GK if he requested) earnings from her entertainment career if not otherwise deposited into the separate checking account of EJ Global, LLC, which was maintained and controlled by GK personnel.

Erika has never had or held herself out as having a law degree or license to practice law.  Erika also never worked in any capacity at GK.  Specifically, Erika did not have any role or participation in GK or TG's handling of client matters, and she did not participate in or control the decisions or actions of GK and/or TG related to finances of client matters or the finances of GK.

In early November 2020, Erika filed in Los Angeles Superior Court a petition for divorce against TG (captioned Erika Girardi v. Thomas Vincent Girardi, LASC case no. 20-STFL-11050) and separated from TG to move into a rental, where Erika has resided since that time.  The divorce case is pending but has not been finalized due to the automatic stay in place since December 18, 2020, when certain petitioning creditors, concurrently with filing an involuntary bankruptcy petition commencing the

bankruptcy case of GK, filed an involuntary chapter 7 bankruptcy commencing a bankruptcy case of TG in the same Bankruptcy Court, which the Bankruptcy Court has been administering concurrently with the GK bankruptcy case.

b.      **Defendants' Factual Contentions Related to EJ Global LLC**.  At all relevant times, Erika has been EJ Global LLC's sole member and designated as its manager.  EJ Global LLC was formed by GK or TG, based upon TG recommending to Erika that she should have a business entity through which she could pursue her entertainment career.  TG, GK, and outside accountants hired by TG and GK handled and managed the finances of EJ Global LLC, including its separate checking account, payment of invoices from third party vendors or creditors of EJ Global LLC, and preparation and filing of EJ Global LLC's tax returns.  Similar to the American Express invoices generated on TG's American Express account, Erika did not have individual legal liability for invoices sent to EJ Global LLC by its vendors, which were the responsibility of EG Global LLC.

c.      **Defendants' Factual Contentions Related to PMI**.  Erika formed PMI after her legal separation from TG in early November 2020.  Erika is the sole shareholder and officer of PMI.  As Erika previously testified, after she filed for divorce and separated from TG in November 2020, based upon the advice of her new business manager for the purpose of creating a clear dividing line between pre-separation earnings (which are part of the marital community) and post-separation earnings (which are separate property), in January 2021, Erika formed PMI to conduct her entertainment career.

Given that the Transfers at issue in this case stopped in 2020 and PMI was formed in January 2021, PMI could not have and did not receive any of the Transfers.  Most importantly, it is undisputed that all the Transfers at issue in this case involved payments made directly by GK to either American Express or to third party vendors or

creditors of EJ Global, LLC; and that none of the Transfers involved a payment made to any of Defendants.

*In sum, Erika, EJ Global LLC and PMI <u>never received any of the payments comprising the Transfers at issue in this action</u>. As discussed in section VI. below, Defendants contend this is the most important fact in this case in determining the merits of the Parties' claims and defenses*.

## VII.   PLAINTIFF'S CONTENTIONS OF FACT

Plaintiff contends that the below facts are accurate and common to Plaintiff's claims on all causes of action going to trial.  Defendants object to and dispute many of the below-described alleged facts including as stated by Plaintiff.  As a result, the Parties agreed to include in the prior section and this section of this Joint Final Pretrial Conference [Proposed] Order their respective factual contentions common to all causes of action going to trial.

| 1. | GK was a law firm that did business in Los Angeles, California for over 40 years. |
|---|---|
| 2. | GK was owned and controlled by attorney Thomas V. Girardi ("**TG**") |
| 3. | GK and TG's practice of law was based upon representing individuals who sustained personal injuries, on a contingency fee basis, pursuant to which GK would receive a percentage of any recovery made on behalf of a GK client. |
| 4. | When a recovery was made by GK for a client (either by settlement or judgment) the proceeds of the recovery were to be deposited into a client trust account.  The proceeds from the client trust account were to be disbursed (1) to GK for its attorney fees and costs incurred in the representation and (2) to the client, and for no other purposes. |
| 5. | Erika is TG's estranged spouse.  They were married in the year 2000. |

| | | |
|---|---|---|
| 6. | | In or around 2008 Erika decided to restart her career as a professional entertainer. |
| 7. | | As part of this effort TG advised Erika to form a limited liability company for her entertainment activities. |
| 8. | | Based upon TG's advice, Erika , using the services of GK, formed EJ Global LLC, a California limited liability company. |
| 9. | | Erika is the sole interest holder of EJ Global LLC. |
| 10. | | No capital was provided for EJ Global LLC's business operations. |
| 11. | | EJ Global LLC's books and records were maintained by GK including all financial records related to Erika's entertainment and personal expenses, whether these expenses were incurred in her name or in the name of EJ Global LLC. |
| 12. | | GK, through its accounting department and in conjunction with outside accountants, prepared the tax returns for EJ Global LLC. |
| 13. | | GK, through its accounting department and TG and in conjunction with outside accountants, prepared the personal tax returns of TG and Erika. |
| 14. | | Erika trusted that GK through its accounting department, and TG and the outside accountants, given their superior knowledge and expertise, would prepare proper, lawful, and legitimate tax returns. |
| 15. | | Erika signed married filing joint tax returns during her marriage to TG. |
| 16. | | In or around 2008, TG provided Erika with two American Express cards (Platinum and "Black") issued under TG's personal accounts. |
| 17. | | All charges Erika made using the American Express Cards were paid for by GK. |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| 18. | All third-party vendor billings incurred in the name of EJ Global LLC were paid for by GK. |
|---|---|
| 19. | There are no written agreements documenting the payments made to satisfy Erika's American Express charges or the payments made to satisfy EJ Global LLC's invoices. |
| 20. | No collateral was given to secure repayment for the payments made to satisfy Erika's American Express or payments made to satisfy EJ Global LLC's invoices. |
| 21. | Neither Erika nor EJ Global LLC provided any value for the payments made to satisfy Erika's American Express charges or payments made to satisfy EJ Global LLC's invoices, save and except a payment of $150,000.00. |
| 22. | Intentionally left blank. |
| 23. | On January 31, 2023, TG and Christopher Kamon ("Kamon") were indicted on five counts of wire fraud in *United States v. Girardi, et al.* Cr. No. 23-00047, Central District CA. |
| 24. | On August 27, 2024 after a jury trial on the indictment, TG was found guilty on all counts of the indictment that were submitted to the jury. |
| 25. | On October 8, 2024, the United States Attorney for the Central District and Kamon entered into a plea agreement pursuant to which Kamon pleaded guilty to one wire fraud count of a criminal Information filed against him in *United States v. Kamon*, Cr. No. 23-00024, Central District of CA and one wire fraud count of the indictment in *United States v. Girardi, et al.* Cr. No. 23-00047. |
| 26. | As part of the plea agreement, Kamon admitted to the following facts: |

-11-

| 27. | From in or about 2004 until in or about December 2020, Kamon was head of the accounting department at the law firm GK. |
|---|---|
| 28. | GK was a law firm that was located in Los Angeles, California, and was owned and managed by TG. |
| 29. | Kamon worked closely with TG, supervised GK's accounting department, and was in charge of facilitating the firm's payment of expenses. |
| 30. | Kamon had access to, knowledge of the balances, and, at TG's direction oversaw various GK attorney-client trust accounts, also called an "Interest on Lawyer's Trust Account" or "IOLTA" accounts, at TG's direction, including an account at Torrey Pines Bank, bearing an account number ending in 5859 (the "Torrey Pines IOLTA Account"), and an account at Nano Banc, bearing an account number ending in 0567 (the "Nano Banc IOLTA Account"). |
| 31. | An IOLTA account is intended as a short-term place wherein settlement money would be deposited and funds promptly would be sent to the respective clients. Typically, TG determined and directed which clients would be paid, how much they would be paid, when they would be paid and signed all outgoing checks to clients. |
| 32. | Kamon had signatory authority on additional bank accounts maintained by GK, including two operating accounts, a Torrey Pines Bank account ending in 9821 ("Account 9821") and a Nano Banc account ending in 0096 ("Account 0096"). Kamon used Account 9821 and Account 0096 to pay GK's operating expenses, such as payroll, rent, and other day-to-day costs. Generally, TG called Kamon each morning and asked for the balances of the GK bank accounts, including the IOLTA accounts. |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| 33. | When the GK operating accounts were low, Kamon would relay this information to TG.  TG would then instruct Kamon to withdraw funds from the GK IOLTA accounts and identify the withdrawal as "attorney fees" from the cases. |
|---|---|
| 34. | If TG instructed Kamon to transfer attorney fees from a case in which fees had already been taken, Kamon would so inform TG, who would instruct Kamon "do it anyways." |
| 35. | Beginning at least as early as in or around 2010 and continuing through at least in or around December 2020, in Los Angeles County, TG and Kamon together with others, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim clients to whom TG and GK had agreed to provide legal services as to material matters, and to obtain money and property from such victim clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts. |
| 36. | In furtherance of the scheme, attorneys at GK, including TG, would negotiate a settlement on behalf of a client that would require the payment of funds to the client.  TG and, at times, others with knowledge would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts, including the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account.  TG would thereafter embezzle and misappropriate settlement funds from the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account belonging to GK clients for improper purposes. |
| 37. | The improper purposes included, among other things, paying other GK clients whose own settlement funds had previously been |

-13-

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| | | |
|---|---|---|
| | | misappropriated, paying GK's payroll, and paying other GK expenses, including its American Express Card bills encompassing charges for TG and Kamon's personal expenses. |
| 38. | | On June 4, 2025, TG was sentenced to serve 87 months in the federal prison system. |
| 39. | | Between 2008 and 2020 GK made net payments totaling at least $14,259,012.84 to American Express for charges benefitting Erika made on credit cards issued on TG's personal American Express account, including cards issued in Erika's name |
| 40. | | Between 2008 and 2020 GK made net payments totaling at least $11,483,248.42 in payment of EJ Global LLC vendor invoices. |
| 41. | | GK made net payments totaling at least $25,742,261.26 for the benefit of the Erika and EJ Global LLC (the "Transfers") [1] |
| 42. | | By the express design of TG and Kamon, the payments comprising the Transfers were booked and accounted for by GK on accounting records as an inter-company debt owed solely by EJ Global LLC. |
| 43. | | Erika made no payments on the account save and except for $150,000.00. |

## VIII.    THE PARTIES' CLAIMS AND DEFENSES

This section discusses the Parties' claims and defenses organized by each of the claims that Plaintiff is pursuing at trial.

As evidenced by the sub-headings below, the text underneath each sub-heading represents the contentions of that party only.

---

[1] Plaintiff is limiting its damage claims for payments made by GK on behalf of Defendants to the ten-year period between November 18, 2010 through November 18, 2000.  The total amount paid during this period: $16,256,327.58.

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

In addition, many of the contentions of the Parties are the subject of Defendants' motions *in limine* 1 through 3 and/or Plaintiff's motions *in limine* 1 through 6 (collectively the "**MILs**").  If it assists the Court, after the Court decides the MILs, the Parties are willing to meet and confer and submit a revised version of this Final Pretrial Conference [Proposed] Order consistent with the Court's rulings on the MILs.

## 1. PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS (FOURTH, FIFTH, SIXTH, SEVENTH, AND EIGHTH CLAIMS).

**CLAIM 4:  Avoidance and Recovery of Fraudulent Transfers, Actual Intent [11 U.S.C. §§ 544(b) and 548 and Cal Civ. Code § 3439.04(a)(1)].**

### a. Elements of Claim 4 Per Plaintiff

A trustee may avoid transfers or obligations that could have been avoided by an unsecured creditor under applicable non-bankruptcy law had the bankruptcy case not been filed, provided such a creditor actually exists as having been made by the debtor with the actual intent to hinder, delay or defraud a creditor in violation of California's Uniform Voidable Transfer Act ("UVTA"), which states:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Cal. Civ. Code § 3439.04(a).

The UVTA identifies 11 non-exclusive factors, or "badges of fraud" that may be applied by a court to divine fraudulent intent:

1. Whether the transfer or obligation was to an insider.

2. Whether the debtor retained possession or control of the property after the transfer.

3. Whether the transfer or obligation was disclosed or concealed.

4. Whether the debtor was sued or threatened with suit before the transfer was made or obligation incurred.

5. Whether the transfer was of substantially all of the debtor's assets.

6. Whether the debtor absconded.

7. Whether the debtor removed or concealed assets.

8. Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or obligation incurred.

9. Whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation incurred.

10. Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

11. Whether the debtor transferred essential assets of the business to a lienholder who then transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b).

-16-
JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

The UVTA factors are intended "to provide guidance to the trial court, not compel a finding one way or another." *Filip v. Bucurenciu,* 129 Cal.App.4th 825, 834 (2005).

The UVTA list of "badges of fraud" provides neither a counting rule nor a mathematical formula.  No minimum number of factors tips the scales toward actual intent.  A trier of fact is entitled to find actual intent based on the evidence in the case, even if no "badges of fraud" are present.  Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of "badges of fraud." *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 236 (9th Cir. BAP 2007)

The debtor's state of mind "is the focus in the inquiry into actual intent." *Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 716-717 (9th Cir. BAP 1996) ("[T]he adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question of whether the transfer is actually fraudulent.").

As stated by the Supreme Court in *Husky Int'l  Elecs., Inc. v. Ritz ,* 578 U.S. 355, (2016) ("*Husky*"), "there is no need to adopt a definition for all times and all circumstances . . .  because, from the beginning of English bankruptcy practice, courts and legislatures have used the term "fraud" to describe a debtor's transfer of assets that, . . . impairs a creditor's ability to collect the debt.  The *Husky* court then noted that "[i]n modern times Parliament made it fraudulent to hide assets from creditors by giving them to one's family, friends or associates.  *Husky* at 361.  The Supreme Court continued:  "As a basic point, fraudulent conveyances are not an inducement-based fraud.  Fraudulent conveyances typically involve "a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration."  *Id.*  And, "the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt. It is in the acts of concealment and hindrance.  In the fraudulent-conveyance context, therefore, the opportunities for a false representation

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

from the debtor to the creditor are limited.  The debtor may have the opportunity to put forward a false representation if the creditor inquires into the whereabouts of the debtor's assets, but that could hardly be considered a defining feature of this kind of fraud.  Husky at 362.  In sum, the  now common understanding is that a "conveyance which hinders, delays or defrauds creditors shall be void against the recipient unless . . . that party . . . received it in good faith and for consideration." *Id.*  *See also* Cal. Civ. Code § 3439.08 (A transferee may be entitled to keep the transfer if she can show that she is "a person who took in <u>good faith and for a reasonably equivalent value</u>.")  (emphasis added).

   b. **<u>Plaintiff's Rebuttal to Defendants' Contentions Regarding "Transferee Beneficiary Liability" in Section VIII.1.d. Below</u>**

   Defendants, without any factual basis, and without citation to any authority, assert that Defendants did not receive any of the Transfers at issue as all of the Transfers went to third parties.  Defendants' contention borders on the non-sensical.

   The UVTA allows a judgment to be entered against:

   (1) the first transferee of the fraudulently transferred asset;

   (2) the transfer beneficiary; and

   (3) any subsequent transferee other than a good faith transferee for value.

Cal. Civ. Code § 3439.08 (b)(1) & (b)(2).

   Section 3439.08(b)(1)(A) provides that:  "(b) [t]o the extent a transfer is avoidable . . . the following rules apply:  (1) . . . [t]he creditor may recover judgment for the value of the asset transferred . . . .  The judgment may be entered against the following:  (A) The first transferee of the asset or the person for whose benefit the transfer was made."  Cal. Civ. Code § 3439.08(b)(1)(A).

   11 U.S.C. section 550(a)(1) provides that:  "(a) . . . to the extent that a transfer is avoided . . . the trustee may recover . . . the property transferred, or, if the court so

orders, the value of such property from:  (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made."  11 U.S.C. § 550(a)(1).

Both statutes essentially mirror one another and refer to the "the person [or entity] for whose benefit the transfer was made."

The paradigm example of a transfer beneficiary is a guarantor.  When the guaranteed debt is paid, the guarantor has not received the money, but it did receive a benefit—release from its guarantee.  *Official Comm. of Unsecured Creditors v. Fountainhead Grp., Inc. (In re Bridgeview Aerosol, LLC)* (Bankr. N.D. Ill. 2015) 538 B.R. 477, 512.)  Yet this model is not exclusive.  (*In re Meredith* (4th. Cir. 2008) 527 F.3d 372, 375–376.)  The Court's obligation is to look behind the form of the transaction and which entity actually benefited from the transfer.  (*Matter of Compton Corp*. (5th. Cir 1987) 831 F.2d 586, 595.)

Such is the situation presented in this case.  Here, GK paid EJ Global LLC vendor claims and Erika's American Express charges, from which EJ Global LLC benefited by having its liability to third party vendors extinguished.  Erika's benefit included but was not limited to millions of dollars in clothes, jewelry and for medical services – plastic surgeries, among others.  *See* Plaintiff's Exhibit 15 "Expert Report Thomas P. Jeremiassen, re Reconstruction and Evaluation of Receipts and Disbursement activity relating to Erika Girardi and EJ Global from Girardi Keese Financial Records (2008–2020)."  Accordingly, as a result of the Transfers to EJ Global LLC's vendors and to American Express for Erika's purchases and personal services provided to Erika, Defendants (1) actually benefited by the Transfers as they extinguished millions of dollars in creditor claims, and by Erika retaining millions of dollars in goods, etc., (2) in quantifiable amounts and (3) had control over the benefits provided by the transfers.  *See e.g. Lo v. Lee*, 24 Cal. App. 5th 1065, 1073-1074 (2018).

### c. **Plaintiff's Key Evidence in Support of Claim 4:**

1. Between December 19, 2010 and December 18, 2020, GK transferred $11,357,487.37 to American Express to pay for charges incurred by Erika on an American Express card or cards where TG was the account holder.

2. Between December 19, 2010 and December 18, 2020, GK transferred $4,898,840.21 to third party vendors or creditors in payment of invoices submitted to EJ Global LLC.

3. GK made the above-referenced transfers (the "**Transfers**") without receiving any value in return.

4. Between 2010 and 2020, GK used funds from its IOLTA Client Trust Account to support its business operations due to the lack of funds.

5. Beginning at least in or around 2010 and continuing through at least in or around December 2020, in Los Angeles County, TG and Christopher Kamon ("**Kamon**"), together with others, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim clients to whom TG and GK had agreed to provide legal services as to material matters, and to obtain money and property from such victim clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

6. In furtherance of the scheme, attorneys at GK, including TG, would negotiate a settlement on behalf of a client that would require the payment of funds to the client. TG and, at times, others with knowledge would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts, including GK trust accounts known as the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account. TG would thereafter embezzle and misappropriate settlement funds from the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account belonging to GK clients for improper purposes.

7. The improper purposes included, among other things, paying other GK clients whose own settlement funds had previously been misappropriated, paying GK's payroll, and paying other GK expenses, including its American Express card bills encompassing charges for TG and Kamon's personal expenses.

8. On January 31, 2023, an Indictment including five counts of federal wire fraud was filed against TG and Kamon, *USA v. Girardi,* Cr. No. 23-00047, C.D. Cal.

9. On August 27, 2024, after a jury trial on the Indictment, TG was found guilty on all four of the counts presented to the jury (out of five originally charged in the indictment), and sentenced to serve 87 months in federal prison.

10. On October 8, 2024, the United States Assistant Attorney's Office and Kamon entered into a plea agreement pursuant to which Kamon pleaded guilty to one count of federal wire fraud in the Indictment in *United States v. Girardi,* Cr. No. 23-00047, C.D. Cal., and one count of federal wire fraud in a criminal Information filed against Kamon in *United States v. Kamon*, Cr. No. 23-00024, C.D. Cal.

### d. **Defendants' Defenses to Claim 4.**

**i. Plaintiff on All its Fraudulent Transfer Claims (Nos. 4, 5, 6, 7 and 8) Bears the Burden of Proof to Establish Both: (A) an Avoidable Transaction; and (B) the Right to a Recovery in the Form of a Money Judgment Against Defendants.**

Plaintiff in this action seeks a money judgment against Defendants. Under both state law and federal law, to obtain a money judgment, a plaintiff bringing a fraudulent transfer claim (regardless of whether for intentional fraudulent transfers or constructive fraudulent transfers) must plead and prove by a preponderance of the evidence facts establishing: (1) an avoidable transaction; and (2) an entitlement to a recovery in the form of money judgment against the defendant.

In this case, based upon alleged avoidable transactions constituting fraudulent transfers, Plaintiff seeks the recovery remedy of a money judgment against

Defendants under both state law, the California Uniform Voidable Transfers Act, Civil Code §§ 3439, *et seq*. (the "**UVTA**"), and federal law, Bankruptcy Code section 550(a)(1) (11 U.S.C. § 550(a)(1)).

For plaintiff to be entitled to the recovery remedy of a money judgment, the UVTA and the Bankruptcy Code contain virtually identical provisions, as follows:.

The UVTA, at Civil Code section 3439.08(b)(1)(A), provides in pertinent part:

(b) To the extent a transfer is avoidable in an action by a creditor [i.e., an intentional or constructive fraudulent transfer under the UVTA], the following rules apply:

(1) . . . **[t]he creditor may recover judgment for the value of the asset transferred**, as adjusted under subdivision (c), or the amount of the creditor's claim, whichever is less.  **The judgment may be entered against the following**:

(A) **The *first transferee* of the asset *or the person for whose benefit the transfer was made***.

Cal. Civ. Code § 3439.08 (b)(1)(A) (emphasis added).

Similarly, Bankruptcy Code section 550(a)(1) provides:

(a) . . . to the extent that a transfer is avoided . . ., **the trustee may recover** . . . the property transferred, or, if the court so orders, **the value of such property, from**:

(1) **the *initial transferee* of such transfer *or the entity for whose benefit such transfer was made*** [.]

11 U.S.C. § 550(a)(1) (emphasis added).

In the present case, the Transfers were paid directly to American Express or to vendors or creditors of EJ Global LLC, who were the "first transferees" or "initial transferees" of the Transfers, as defined in Civil Code section 3439.08(b)(1)(A) and Bankruptcy Code section 550(a(1).

Thus, it is undisputed that Defendants, who never received any of the payments comprising the Transfers, were not, are not, and cannot be held liable as the "first transferees" or "initial transferees" under the UVTA or the Bankruptcy Code.

The key question, therefore, as to whether Plaintiff is entitled to a money judgment against Defendants based upon the Transfers – and assuming *arguendo* that Plaintiff can establish by evidence the elements of its fraudulent transfer claims such that the Transfers are avoidable transactions – is whether Defendants constitute "the person for whose benefit the transfer was made" under the UVTA, or "the entity for whose benefit such transfer was made" under the Bankruptcy Code. Both state and federal case law provide the answer, as discussed next.

In *Lo v. Lee*, 24 Cal. App. 5th 1065 (2018), creditors brought fraudulent transfer claims under the UVTA against a debtor father, Mr. Lee, and his son, Mr. You, based upon payments the father had made to Northeastern University to pay his son's tuition. The creditors filed a first amended complaint alleging that under the UVTA, they were entitled to a money judgment against the son as "the person for whose benefit the transfers were made." Due to the lack of authority in state case law, the Court of Appeal looked to federal court decisions interpreting the virtually identical language in Bankruptcy Code section 550(a)(1).

*First*, the Court of Appeal noted:

> Federal courts have observed that "**[t]he paradigm example of a transfer beneficiary is a guarantor. When the guaranteed debt is paid, the guarantor has not received the money, but it did receive a benefit – release from its guarantee**. (*Official Comm. of Unsecured Creditors v. Fountainhead Grp., Inc. (In Re Bridgeview Aerosol, LLC)* (Bankr. N.D. Ill. 2015) 538 B.R. 477, 512.

*Lo v. Lee*, *supra*, 24 Cal. App. 5th at 1073 (emphasis added)

In the present case, Erika was not a guarantor or the equivalent of a guarantor of the debts paid by GK with the Transfers. This is because it is undisputed that Erika did not have an independent legal obligation either (i) to pay the invoices from American Express on an account where TG was the accountholder and the party

-23-

legally responsible for payment, or (ii) to pay the invoices from EJ Global LLC's vendors and creditors, for which Erika was not independently personally liable and which she did not guarantee.

*Second*, the Court of Appeal summarized federal case law on the nature of the "benefit" required for a person to be held liable as "the person or entity for whose benefit the transfer was made":

> Contrary to plaintiff's suggestion, the fact that a person received any kind of "benefit," no matter how intangible or indirect, from a fraudulent transaction does not necessarily subject that person to liability. **There are limits to the legal assessment of the type of "benefit" that will subject a beneficiary to liability for the debtor's alleged fraudulent transfer**. **The benefit received must be "direct, ascertainable and quantifiable" and must bear a " 'necessary correspondence to the value of the property transferred.' "** (*In re Intern. Management Assoc.* (11th Cir. 2005) 399 F.3d 1288, 1293.) **"'[T]ransfer beneficiary status depends on three aspects of the "benefit":   (1) it *must actually have been received* by the beneficiary; (2) it *must be quantifiable*; and (3) it *must be accessible to the beneficiary*.' "** (*In re Brooke Corp.* (Bankr. D. Kan. 2013) 488 B.R. 459, 468 (*In re Brooke*).)  This three-part test is used in federal courts to determine whether a party should be subjected to liability as the ultimate beneficiary of an alleged fraudulent transfer. (*Baldi v. Lynch (In re McCook Metals, L.L.C.*) (Bankr. N.D.Ill 2005) 319 B.R. 570, 590–594 (*McCook Metals*); see *Bonded Financial Services v. European Amer. Bank* (7th. Cir 1988) 838 F.2d 890, 896 (*Bonded Financial Services); Sher v. SAF Financial, Inc.* (D.Md. Oct. 11, 2011) 2011 U.S. Dist. Lexis 116967, *8.)  The benefit that is actually received must flow from the initial transfer which is avoided, instead of being a secondary result of the alleged transfer. (*Bonded Financial Services*, at p. 896.)  **The nature of the legal benefit is predicated on the "disgorgement-based understanding of recovery of fraudulent transfers** from those benefitting from the transfer. ... [T]he benefit actually received must flow from the initial transfer which is avoided." (*In re Brooke*, at p. 469.) **The three-part test must be satisfied for recovery of a transferred property** under 11 U.S.C. section 550(a)(1) from the ultimate beneficiary. (*McCook Metals, LLC.*, at p. 590.)

-24-

In addressing the first element, the *McCook Metals* court clarified that "**an actual benefit** rather than a merely intended one **must be received** in order for the beneficiary to be liable under [11 U.S.C.S. section 550(a)(1) ]." (*McCook Metals*, *supra*, 319 B.R. at p. 591.) The reason for this requirement is that "**fraudulent transfer recovery is a form of disgorgement," which cannot be maintained against parties who do not actually benefit from the transfer**. (*Ibid*.) But even if [the debtor's son, Mr. You's] education qualifies as an "actual benefit," a point we do not decide, the two remaining requirements set forth in *McCook Metals* are not satisfied by the allegations in the FAC.

As to the second prong, courts have stated that in order for a benefit to be "quantifiable," "**[a] merely theoretical benefit is not sufficient, since it would not be subject to disgorgement**." (*McCook Metals*, *supra*, 319 B.R. at p. 591.)  Clearly, there is no way to quantify the intellectual and other benefits You received from the educational opportunity afforded him by Lee's transfer.  Even plaintiff concedes "**a creditor cannot levy on the student's college education**." **Any such benefits** are entirely intangible and theoretical, and **could never be disgorged by him** as they cannot be valued solely in terms of dollars and cents.

Additionally, the **benefit You received is not, and never was, "accessible" to him.  Lee's funds were transmitted directly to Northeastern**, and there are **no allegations suggesting that the funds were ever controlled by You**.  In addressing this prong, the *McCook Metals* court noted that "**[e]ven if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had access to it**." [citation omitted].  Here, You had no control over the funds that Lee transferred to the school, and the FAC **does not allege that he had access to these funds** at any point in time.

We conclude plaintiffs have not adequately alleged a valid transferee beneficiary theory against You.

*Id*., 24 Cal. App. 5th at 1073-1075 (emphasis added).

Under the above federal case law summarized in *Lo v. Lee*, Defendants did not receive a sufficiently quantifiable benefit to be subjected to liability under a transferee beneficiary theory.  Defendants never received, never had access to, and had no

control over or access at any time to the payments made by GK to American Express and vendors of EJ Global LLC.  Accordingly, Plaintiff cannot meet its burden of proof to be entitled to a money judgment against Defendants and all of Plaintiff's fraudulent transfer claims (Claim Nos. 4, 5, 6, 7 and 8) should be dismissed.

ii. **Defense relating to the "the value of the asset transferred" under Cal. Civ. Code § 3439.08(b)(1) and 3439.08(c), and "the value of such property" under Bankruptcy Code section 550(a).**

If and only if Plaintiff meets its burden of proof under state and federal law to show that any of Defendants received a sufficient "benefit" to be liable as "a person [or entity] for whose benefit the transfer was made," section 3439.08.08(b)(1) of the UVTA and section 550(a) of the Bankruptcy Code provide, respectively, that the amount of the money judgment to which Plaintiff is entitled is measured based upon "the value of the asset transferred" or "the value of such property."  Cal. Civ. Code §3439.08(b)(1) and 11 U.S.C. § 550(a).

In this case, it is therefore necessary for the factfinder to quantify the alleged value of the "benefit" received by any of the Defendants from the Transfers.  Because Defendants never received the actual payments comprising the Transfers, the "value" of the asset or property transferred must be quantified by the factfinder.  In this regard, section 3439.08(c) of the UVTA, and similar equitable principles in bankruptcy law, permit the factfinder, in determining the "value" of the asset or property transferred, to adjust the value by taking into account the facts, circumstances, and equities.  Thus, section 3439.08(c) of the UVTA provides that "[i]f the judgment under subdivision (b) is based upon the value of the asset transferred, the judgment shall be for an amount equal to the **value of the asset at the time of the transfer, _subject to adjustment as the equities require_**."  Cal. Civ. Code § 3439.08(c) (emphasis added).

In this case, Defendants will put on evidence showing that the benefit to Defendants from the Transfers, if deemed sufficiently direct, ascertainable, and

-26-

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

accessible to Defendants to render them liable as required by the above-referenced law on transfer beneficiary liability, then the "value" of the property or asset transferred (which Defendants never received) must be substantially reduced from the dollar amount of the Transfers.  Among other things, as discussed below, the evidence will show that the Transfers, in fact, only have resulted in a multi-million dollar tax **liability** asserted against Erika by the FTB.  Under the equities, therefore, in the context of transactions not structured or put together by Defendants, but rather, designed and implemented by TG, GK and their outside accountants and leading only to harm to Erika, the value of the Transfers was actually zero or negative.  It is also inequitable, as discussed below, for the Trustee (and now Plaintiff), who stand in the shoes of GK, to bring claims against Erika and the other Defendants based upon the Transfers that will amount to a double punishment of Erika on top of the asserted multi-million tax liabilities claimed from her by the FTB.

> **iii.    Before Addressing Whether Plaintiff Has Met its Burden of Proof on the Elements Necessary to Establish a Right to a Recovery or Money Judgment Against Defendants, Plaintiff Must Establish that the Transfers Were Avoidable Transactions.**

Plaintiff also does not have evidence to meet its burden to show that the alleged fraudulent transfers were or are avoidable transactions.  As argued in Defendants' motions *in limine* nos. 1 and 3, Plaintiff relies on inapposite Ponzi scheme cases to try to shoehorn the allegations in the indictment of TG and the guilty plea of Kamon, which while for fraud on specified GK clients, did not involve actual charges and convictions or a plea agreement for operating full-blown Ponzi schemes as in the cases upon which Plaintiff relies.

Further, as argued in Defendants' motion *in limine* no. 3, Plaintiff and its predecessor the Trustee retained preeminent financial experts well-versed in providing the standard insolvency opinions in fraudulent transfer litigation to prove the

insolvency element of Plaintiff's constructive fraudulent transfer claims (as to which Plaintiff bears the burden of proof), but inexplicably, Plaintiff has offered no such expert insolvency opinion.

Finally, a substantial question exists regarding whether GK received full or reasonably equivalent value in exchange for making the payments on the American Express invoices at issue on an account under which TG, GK's 100% owner, was the account holder and legally responsible for payment. *See* Cal. Civ. Code § 3439.03 ("Value is given for a transfer . . . if, in exchange for the transfer . . . an antecedent debt is . . . satisfied [.]"). Each GK payment to Amex satisfied an antecedent debt owing by GK's 100% owner and, therefore, GK received full if not reasonably equivalent value. This is even more the case if, as the Trustee has alleged in other contexts, GK was actually a sole proprietorship with TG as its 100% owner.

### e. Defendants' Key Evidence In Support of Defenses to Claim 4.

None of the "Transfers" at issue involved an actual transfer, conveyance or payment of funds to Erika or any of the Defendants.

By the express design of TG, GK, and/or their outside accountants, the payments comprising the Transfers were booked and accounted for by GK solely as an alleged debt of EJ Global LLC to GK, and **not** as an individual liability or debt of Erika to GK. The Trustee and Plaintiff stand in the shoes of GK. GK was comprised of attorneys who fully understood the difference between a debt owed by a limited liability company, as opposed to an individual debt owed by an interest holder in a limited liability company, such as Erika. No promissory note exists to memorialize the alleged debt owing to GK by EJ Global LLC that was booked by GK based upon the Transfers. GK was fully capable of preparing such a written memorialization of EJ Global LLC's alleged debt obligation but never did so.

Further, no promissory note, writing, or other evidence exists that Erika at any time agreed to undertake any personal liability or debt to GK, based upon the

Transfers that gave rise to the alleged receivable booked by GK as owing to it by ***only*** EJ Global LLC.  Accordingly, Erika has no individual or personal liability for the alleged debt of EJ Global LLC resulting from the Transfers; and no evidence exists that Erika undertook or agreed to any such individual or personal liability.  Rather, the only evidence is that based upon the Transfers, sophisticated attorneys of GK structured, accounted for, and characterized the alleged debt at issue as owing only by a limited liability company, EJ Global LLC.

The payment structure that gave rise to the Transfers was put in place **solely** by TG, GK, and outside accountants retained by them.  One of Plaintiff's experts has opined that the structure amounted to tax fraud.  The problem is that the tax authorities, including the California Franchise Tax Board ("**FTB**"), already have asserted tax liabilities against Erika for an amount of approximately $4 million based on the very transactions at issue that led to the Transfers.  In effect and in fact, first the Trustee and now Plaintiff seek to impose a double penalty on Erika on top of the millions of dollars in tax liabilities asserted against her by the FTB.  Taking all these undisputed facts into account, Plaintiff's assertion that Erika somehow benefitted unfairly from the Transfers is the opposite of the truth.  The Transfers, in short, put in place by TG, GK, and outside accountants hired by them, have only caused harm to Erika whose only mistake was to put trust in her attorney then-husband, his law firm, and outside accountants on issues where they allegedly had superior knowledge and sophistication.

**CLAIM 5:  Avoidance Of Fraudulent Transfers, Constructive Intent, Pursuant to 11 U.S.C. §§ 544(b) and 548 and Cal Civ. Code § 3439.05**.

   a.  **Elements of Claim 5 Per Plaintiff.**

Unlike a claim for actual fraudulent transfers, the issue here is not the transferor's intent, but whether the transferor received reasonably equivalent value in

exchange for the transfer, and whether at the time of the transfer, the transferor was insolvent or became insolvent as a result of the transfer.

### b. Plaintiff's Key Evidence in Support of Claim 5.

The facts supporting this claim are set forth in the discussion on Claim 4 above. Neither Erika nor EJ Global LLC provided GK with reasonably equivalent value in exchange for any of the Transfers.  The only payment made on a $16 million obligation was $150,000.  That payment was to reduce the obligation, but was not reasonably equivalent value in exchange for the Transfers.

GK's insolvency and inability to pay debts as they matured is established by TG's criminal conviction that he was operating a massive wire fraud scheme between 2010 and 2020.

Kamon's admissions that TG embezzled and misappropriated settlement funds from the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account belonging to GK clients for improper purposes; and, that the improper purposes included, among other things, paying other GK clients whose own settlement funds had previously been misappropriated, paying GK's payroll, and paying other GK expenses, including its American Express Card bills encompassing charges for TG and Kamon's personal expenses. This admission and conduct precludes any evidence that GK was not insolvent at the time of the Transfers, since the Transfers took place during the same time TG and Kamon were engaged in their fraudulent scheme.

### c. Defendants' Defenses to Claim 5.

Defendants incorporate by reference their defenses discussed above in response to Claim 4.

**CLAIM 6:  Avoidance Of Fraudulent Transfers, Constructive Intent, Pursuant to 11 U.S.C. §§ 544(b) and 548 and Cal Civ. Code § 3439.04(a)(2)(A).**

a. **Elements of Claim 6 Per Plaintiff.**

The Sixth Claim requires a determination that the Transfers by GK for the benefit of Erika and EJ Global LLC were made without receiving reasonably equivalent value in exchange and that GK was engaged or was about to engage in a business or transaction for which GK's remaining assets were unreasonably small in relation to the transaction. California Civil Code § 3439.04(a)(2)(A).

b. **Plaintiff's Key Evidence in Support of Claim 6.**

The facts supporting this claim are set forth above (Claim 4 and Claim 5).

c. **Defendants' Defenses to Claim 6.**

Defendants incorporate by reference their defenses discussed above in response to Claim 4.

**CLAIM 7: Avoidance Of Fraudulent Transfers, Constructive Intent, Pursuant to 11 U.S.C. §§ 544(b) and 548 and Cal Civ. Code § 3439.04(a)(2)(B).**

a. **Elements of Claim 7 Per Plaintiff.**

To prevail on a claim for relief pursuant to §3439.04(a)(2)(B) it must be established that the Transfers were made without reasonable equivalent value and GK intended to incur or believed or reasonably should have believed that GK would incur debts beyond its ability to pay as they became due.

b. **Plaintiff's Key Evidence In Support of Claim 7.**

The facts supporting this claim are set forth above (Claim 4 and Claim 5).

c. **Defendants' Defenses to Claim 7.**

Defendants incorporate by reference their defenses discussed above in response to Claim 4.

**CLAIM 8: Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a).**

a. **Elements of Claim 8 Per Plaintiff.**

Plaintiff's Eighth Claim is based upon 11 U.S.C. § 550(a), which allows the Trustee to recover, for the benefit of the estate, the property transferred, or if the court

orders, the value of such property from the initial transferee, or any immediate or mediate transferee of such initial transferee, except if the transferee takes the transfer for value, in good faith, and prescribes the recovery remedy when a transfer is avoided under section 11 U.S.C. § 544 and 548.

### b. **Plaintiff's Key Evidence in Support of Claim 8.**

The facts supporting this claim are set forth above (Claim 4 and Claim 5). Again, as established in discussion on Claim No. 4 and Claim No. 5, neither Erika nor EJ Global LLC provided any value for the Transfers made.  This fact alone establishes Plaintiff's right to recovery when the Transfer is avoided under section 11 U.S.C. § 544 and 548.

### c. **Defendants' Defenses to Claim 8.**

Defendants incorporate by reference their defenses discussed above in response to Claim 4.  Plaintiff's discussion above regarding Claim 8 mischaracterizes applicable law.

### 2. **PLAINTIFF'S CONVERSION CLAIM (NINTH CLAIM).**

**CLAIM 9:  Conversion.**

### a. **Elements of Claim 9 Per Plaintiff.**

Under California law, "'[t]he elements of a conversion claim are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.'" *Mission Produce, Inc. v. Organic All., Inc.*, 2016 U.S. Dist. LEXIS 39028, 2016 WL 1161988, at *8 (N.D. Cal. Mar. 24, 2016) (quoting *Mindys Cosmetics, Inc. v. Dakar,* 611 F.3d 590, 601 (9th Cir. 2010)).

### b. **Plaintiff's Key Evidence in Support of Claim 9.**

Plaintiff's conversion claim is established by the fact that the Transfers were made for Erika and EJ Global LLC's benefit with money belonging to GK and were a disposition of property rights.  GK was damaged in the amount of  $16,256,327.58.

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

c. **Defendants' Defenses to Claim 9.**

Defendants never took anything and never received anything from GK; and Defendants never engaged in any wrongful conduct.

Plaintiff cannot meet its burden to establish by evidence that any of Defendants at any time took or actively converted property by any sort of wrongful act.  Further, no money, asset, chattel or thing exists or ever was transferred to, given to, or taken by Defendants.  All the Transfers involved payments to third parties.

3. **PLAINTIFF'S COMMON COUNT CLAIMS (ELEVENTH, TWELFTH, AND THIRTEENTH CLAIMS).**

**CLAIM 11:  Account Stated.**

a. **Elements of Claim 11 Per Plaintiff.**

An account stated claim has three elements:  (1) prior transactions between the parties establish a relationship of debtor and creditor; (2) there is an agreement between the parties, either express or implied, to pay the amount due; and (3) the debtor expressly or impliedly promised to pay the amount due.  *Zinn v. Fred R. Bright Co.,* 271 Cal. App. 2d 597, 600 (1969).  The agreement does not have to be expressed and is frequently implied from the circumstances.  An account stated usually "come[s] about by the creditor rendering a statement of the account to the debtor.  *Id.*

b. **Plaintiff's Key Evidence in Support of Claim 11.**

The facts presented above in Claim 4 and 5 established an account stated in that the Transfers made on behalf of Erika Girardi and EJ Global LLC establish a relationship of debtor and creditor; (2) there was an agreement between the parties, either express or implied, to pay the amount due as evidenced by the one $150,000 payment Erika made on the account, which also establishes that (3) Erika and EJ Global LLC expressly or impliedly promised to pay the amount due.

### c. **Defendants' Defenses to Claim 11.**

None of Defendants had anything to do with the one $150,000 payment referred to by Plaintiff. This payment was effectuated purely by GK personnel who had control over the checking account of EJ Global LLC, and no consent was obtained from Erika as the sole member and titular manager of EJ Global LLC before the payment was made.

No debtor-creditor relationship ever existed between Erika and GK. No agreement of any kind existed under which Erika expressly or impliedly agreed to undertake or pay any debt to GK. No statement of account was ever presented by GK to Erika. All these same contentions and defenses apply to PMI, which did not even exist at the time of the Transfers.

One of Plaintiff's own experts opines that insufficient evidence exists of any debtor-creditor relationship, bona fide lending relationship or promissory note between EJ Global LLC and GK. Further, Erika as owner and manager of EJ Global LLC never consented to any such debt, which was purely the creation of GK on its own and never communicated to Erika.

### CLAIM 12: Open Book Account.

#### a. **Elements of Claim 12 Per Plaintiff.**

An open book account is a detailed statement that constitutes the principal record of the transactions between the creditor and debtor arising out of a contract or fiduciary relationship. The statement details the debits and credits in connection with the debtor/creditor relationship. *Cusano v. Klein,* 264 F.3d 936, 942 n.2 (9th Cir. 2001). "An open account results where the parties intend that the individual items of the account shall not be considered independently, but as a connected series of transactions, and that the account shall be kept open . . . until . . . either party [elects] to settle and close the account." *R.N.C. Inc. v. Tsegeletos,* 231 Cal. App. 3d 967, 972 (Cal. Ct. App. 1991).

**b. Plaintiff's Key Evidence in Support of Claim 12.**

GK recorded all of the Transfers made for the benefit of Erika and EJ Global, LLC as inter-company debt on its accounting books and records. Exhibit D attached to the Plaintiff's FAC [Dkt. # 14] is a demand letter for payment of the account. Defendants acknowledged receipt of the demand letter in their Answer to the FAC, but denied any liability for the payment demanded in the letter.

**c. Defendants' Defenses to Claim 12.**

No debtor-creditor relationship ever existed between Erika and GK.  No agreement of any kind existed under which Erika expressly or impliedly agreed to undertake or pay any debt to GK.  No statement of account was ever presented by GK to Erika.  All these same contentions and defenses apply to PMI, which did not even exist at the time of the Transfers.

One of Plaintiff's own experts opines that insufficient evidence exists of any debtor-creditor relationship, bona fide lending relationship or promissory note between EJ Global LLC and GK.  Further, Erika as owner and manager of EJ Global LLC never consented to any such debt, which was purely the creation of GK on its own and never communicated to Erika.

**CLAIM 13:  Money Had and Received.**

**a.  Elements of Claim 13 Per Plaintiff.**

The elements of a money had and received claim are (1) defendant received money, (2) which money was received for plaintiff's use, and (3) defendant is indebted to plaintiff. *Avidor v. Sutter's Place, Inc.*, 212 Cal.App.4th 1439, 1454 (2013).

**b. Plaintiff's Key Evidence in Support of Claim 13.**

Between 2010 and 2020, Girardi Keese Transferred $16,256,327.58 for the benefit of Erika and EJ Global LLC.  As a result Erika and EJ Global LLC are indebted to the Girardi Keese estate.

c. **Defendants' Defenses to Claim 13.**

Plaintiff's description of the alleged facts and legal conclusions above are inaccurate and do not correctly represent applicable law.

Defendants did not receive money from GK in any of the Transfers.

No debtor-creditor relationship ever existed between Erika and GK. No agreement of any kind existed under which Erika expressly or impliedly agreed to undertake or pay any debt to GK. No statement of account was ever presented by GK to Erika. All these same contentions and defenses apply to PMI, which did not even exist at the time of the Transfers.

One of Plaintiff's own experts opines that insufficient evidence exists of any debtor-creditor relationship, bona fide lending relationship or promissory note between EJ Global LLC and GK. Further, Erika as owner and manager of EJ Global LLC never consented to any such debt, which was purely the creation of GK on its own and never communicated to Erika.

4. **PLAINTIFF'S EQUITABLE CLAIMS (TENTH AND FOURTEENTH CLAIMS).**

**CLAIM 10: Constructive Trust.**

a. **Elements of Claim 10 Per Plaintiff.**

Constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1485 (2014). California defines a constructive trust as "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Cal. Civ. Code § 2224. To create a constructive trust, three conditions must be satisfied: "the existence of a res (property or some interest in the

property); the plaintiff's right to that res; and the defendant's acquisition of the res by some wrongful act." *Calistoga Civic Club v. City of Calistoga,* 143 Cal. App. 3d 111, 115 (1983).

### b. Plaintiff's Key Evidence in Support of Claim 10.

As presented in the discussion of Claim 4 and Claim 5, Erika obtained the benefit of the Transfers through TG and Kamon's fraudulent scheme.  The Transfers involved property belonging to GK for which no consideration or value was provided by Erika or EJ Global LLC.

### c. Defendants' Defenses to Claim 10.

Plaintiff cannot establish and meet its burden to show that any of Defendants at any time took, possessed, or possess any property or item of value that, under a constructive trust remedy, the "return" of which could be compelled.  Under the Transfers, no money, asset, chattel or thing exists or was wrongfully given to or taken by Defendants.  All the Transfers involved payments to third parties.

### CLAIM 14:  Unjust Enrichment.

### a. Elements of Claim 14 Per Plaintiff.

A claim for unjust enrichment requires a plaintiff to plead two elements: "receipt of a benefit and unjust retention of the benefit at the expense of another." *Pinel v. Aurora Loan Servs., LLC, 814 F. Supp. 2d 930, 944 (citing Peterson v. Cellco P'ship, 164 Cal.App.4th 1583, 1593, (2008)).*  The benefits must generally be 'conferred by mistake, fraud, coercion, or request; otherwise, though there is enrichment, it is not unjust.'"  *Kelleher v. Kelleher*, 2014 U.S. Dist. LEXIS 2773, 2014 WL 94197, at *7 (N.D.Cal. Jan. 9, 2014) (citing *Nibbi Bros., Inc. v. Home Fed. Sav. & Loan Ass'n*, 205 Cal. App. 3d 1415, 1422, 253 Cal. Rptr. 289 (1988)).

### b. Plaintiff's Key Evidence in Support of Claim 14.

Here, the benefits were conferred by fraud, and impliedly by the request of Erika in that she used her American Express card to support her lifestyle and career,

knowing that her income from her entertainment activities could not support the expenses incurred, and knew that GK was paying EJ Global LLC's vendor invoices again given her income from her entertainment activities could not satisfy the amount of the invoices.

### c. **Defendants' Defenses to Claim 14.**

Defendants at no time ever "unjustly retained" any benefit, direct or indirect, received from GK.

Under the Transfers, no benefit was ever conferred on Defendants by mistake, fraud, coercion or unjust request made to or imposed on GK.  In fact, the transactions giving rise to the Transfers were the idea of TG and GK, in whose shoes the Trustee (and now Plaintiff) stands, and were implemented solely by TG and GK with the assistance and based on the advice of outside accountants retained by them.

### 5. **PLAINTIFF'S ALTER-EGO AND SUCCESSOR LIABILITY CLAIMS.**

After meeting and conferring, Plaintiff and Defendants, through counsel, have agreed to the following:

### a. **EJ Global LLC and Erika**.

Plaintiff is bringing an alter-ego claim for veil-piercing related to EJ Global LLC, meaning that if and to the extent Plaintiff on any of its above claims is entitled to a money judgment against EJ Global LLC, Plaintiff seeks to pierce the corporate veil of EJ Global LLC resulting in Erika being liable for any money judgment in this case as to which EJ Global LLC is liable.

Plaintiff and Defendants have acknowledged that there is a split in authority as to whether alter-ego claims are to be determined by jury or as an equitable remedy that must be determined by the Court.  By way of example, when presented with the question of whether plaintiff has a right to jury trial for an alter ego claim, the Court in *Siegel v. Warner Bros. Entm't Inc.,* 581 F. Supp. 2d 1067, 1076 (C.D. Cal. 2008) concluded that plaintiff has no such right.  The Court reasoned that an alter

ego action is analogous to actions historically brought in both courts of law and equity, but the nature of the remedy is equitable because of the "inherent discretion[]" a court has in deciding whether to find alter ego liability. *Id*. at 1074-75; *but see*, *Davis v. Carrington*, 2012 U.S. Dist. LEXIS 200010 (C.D. Cal. 2012) ( The question of whether defendant is an **alter ego** of a company rested on disputed facts that must be determined by the jury).

The decision on whether the alter-ego claims are for the Court or jury is up to the Court.  Depending on the Court's determination, the Parties will submit additional jury instruction or alternatively provide the Court with proposed findings of fact and conclusions of law.

### b. <u>PMI and EJ Global LLC; and PMI and Erika</u>.

Unlike the circumstance with EJ Global LLC, as to which Plaintiff is bringing a direct claim or claims for a money judgment under one or more of the nine claims going to trial, Plaintiff is not bringing a direct claim against PMI for liability and a judgment under any of Plaintiff's above-referenced nine claims going to trial.  Rather, Plaintiff seeks to hold PMI liable in this case under one of two legal theories:

*First*, as to any judgment for which EJ Global LLC may be liable on any of the above nine claims, Plaintiff alleges that PMI is liable under a "successor liability" theory of liability.  The Parties agree that, depending on how the Court decides whether the alter-ego claim is to be decided by the Court or the jury, this successor liability claim should be similarly adjudicated.

*Second*, as to any judgment for which Erika may be liable on any of the nine claims going to trial, Plaintiff alleges that PMI is liable under what is called a "reverse veil-piercing" alter-ego theory of liability.  Once again, the Parties agree that, depending on how the Court decides whether the alter-ego claim is to be decided by the Court or the jury, this successor liability claim should be similarly adjudicated.

### c.  Elements of Alter-Ego Claim Per Plaintiff.

Plaintiff has asserted that EJ Global LLC was and is Erika's alter-ego.  Before the doctrine may be applied, Plaintiff must prove two elements: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow."  *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1066 (C.D. Cal. 2002) (quoting *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300, 216 Cal. Rptr. 443, 702 P.2d 601 (1985)).

### d.  Plaintiff's Key Evidence in Support of Alter-Ego Claim.

The evidence establishes that:

1.  Erika and TG caused to be formed EJ Global LLC.
2.  There was no capital provided for EJ Global LLC's business operations.
3.  The corporate formalities were not adhered to.
4.  Erika was the sole member of EJ Global LLC.
5.  Erika diverted funds that should have been paid to EJ Global LLC to herself, by having production companies issues checks in her name or her maiden name.
6.  Erika purchased clothing, make-up,  costumes etc., that she used in her entertainment activities using her personal American Express card.
7.  All payments made on behalf of Erika for her American Express charges and payments made on behalf of EJ Global LLC were accounted for as "inter-company debt".
8.  EJ Global LLC never generated sufficient income to sustain it as an independent company.
9.  Between 2010 and 2020, GK transferred $4,898,840.21 to satisfy EJ Global LLC vendor invoices.

-40-
JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

10. EJ Global LLC never paid any of its invoices from income received by EJ Global LLC.

11. It would  be inequitable to permit Erika to escape liability for the $4,898,840.21 in EJ Global LLC vendor invoices that were paid by GK.

### e.  **Defendants' Defenses to Alter-Ego Claim.**

EJ Global LLC at all times was a properly organized LLC, filed its required filings with the California Secretary of State, maintained a separate bank account, and filed its own tax returns.  GK, in whose shoes the Trustee (and now Plaintiff) stands, maintained accounting records for GK.

PMI was similarly properly incorporated in California for legitimate reasons; it has filed all required filings with the California Secretary of State; it maintains a separate bank account; it has been professionally managed by Erika's manager from the time of its incorporation; it has maintained full and robust accounting records; and it has filed separate and timely tax returns.

Erika did not use EJ Global LLC or PMI to engage in any form of inequitable conduct and has not misled vendors or creditors of these entities in any way.  GK, in whose shoes the Trustee (and now Plaintiff) stands, itself put in place the structure of payment transactions and accounting of which the Transfers were a part, based upon the advice of outside accountants.  Erika at all times relied on the superior knowledge and expertise of her then-attorney husband, GK, and the accountants retained by TG and GK.

### 6.  **DEFENDANTS' AFFIRMATIVE DEFENSES IN THE ANSWER TO FAC THAT ARE RELEVANT OR POTENTIALLY RELEVANT TO THE OUTCOME AT TRIAL.**

Defendants reserve all rights regarding their affirmative defenses of statute of limitations and statute of repose under the California UVTA, and unclean hands and *in*

*pari delicto* to the extent Plaintiff seeks to profit from conduct of GK that was inequitable or wrongful.

## VIII. REMAINING TRIABLE ISSUES

The remaining triable issues include whether Plaintiff at trial can meet its burden of proof to establish by a preponderance of the evidence the elements of each of the claims as to which Plaintiff is proceeding at trial, as elaborated in detail in section VI. above.

## IX. DISCOVERY

All discovery is complete, except that to the extent Plaintiff seeks to add new witnesses to the Joint Witness List not previously identified in the Trustee's prior Rule 26 disclosures or discovery responses, Defendants object to the addition of such witnesses at this late juncture.  Alternatively, Defendants request leave to take depositions and obtain documents at depositions of any such witnesses identified for the first time on the eve of trial.

## X. DISCLOSURES AND EXHIBIT LIST

All disclosures under Fed. R. Civ. P. 26(a)(3) have been made.

The Joint Exhibit List of the parties has been previously filed under separate cover as required by L.R. 16-6.1 ("Joint Exhibit List").  The Parties have been working on an amended Joint Exhibit list that will be complete in all columns, including objections to admission of exhibits into evidence.  Per the Court's rules, the Parties will file their final amended Joint Exhibit List before 12 p.m. on the Friday before the trial date.

## XI. WITNESS LIST

The Parties' Joint Witness List has been previously filed under separate cover as required by the Court's Scheduling Order; and the Parties filed an updated Joint Witness List on January 12, 2026.  The following table incorporates those witnesses that the Parties intend to include at trial.  The following table also includes reduced

estimated times for examination by the Parties, in an effort to comply with the Court's directive at a prior hearing on May 7, 2026, at which the Court stated that each side, meaning Plaintiff and Defendants, would be permitted ten hours of examination time at trial, subject to increase only upon good cause shown.

The Joint Witness List below also includes at least two new witnesses added by Plaintiff earlier this month, along with a notation of Defendants' objections.

## JOINT WITNESS LIST

### A. Plaintiff LHA Land, LLC Witness List

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| Elissa D. Miller Chpt. 7 Trustee, Estate of Girardi Keese. "Trustee"). Telephone No.: 213-626-2311 Address: Greenspoon Marder 1875 Century Park East, Ste 1900 Los Angeles, CA 90067 | Trustee will testify as to the administration of the estate, and as custodian of records of Girardi Keese. | 1 Hour | .5 Hour | 5.26.2026 |

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| Thomas P. Jeremiassen<br><br>Telephone No:<br><br>213-617-2717<br><br>Address:<br><br>Development Specialists, Inc.<br>333 South Grand Ave, Ste 4100, Los Angeles, California 90071 | Reconstruction and evaluation of receipts and disbursement activity relating to Erika Girardi and EJ Global from Girardi Keese Financial Records (2008–2020) | **1.5 Hours** | **.75 Hours** | |
| Nicholas Troszak<br><br>Telephone No.:<br><br>213-617-2717<br><br>Address:<br><br>Development Specialists, Inc.<br>333 South Grand Ave, Ste 4100, Los Angeles, California 90071 | Designated expert on Girardi Keese Cash Sources and Use, commingling of trust funds, and insolvency. | **1.5 Hours** | **.75 Hour** | |

-44-

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| John J. Menchaca 213-683-3317 Menchaca & Co. 835 Wilshire Blvd. Ste 300, Los Angeles, CA 90017 | Designated expert Tax Fraud issues regarding Erika Girardi and Thomas Girardi's personal tax returns. | 1 Hour | .75 Hour | |
| Erika Girardi<br><br>Telephone No.:<br><br>949-383-2860<br><br>Address:<br>c/o Evan C. Borges Greenberg Gross LLP 650 Town Center Dr., Ste 1700, Costa Mesa, CA 92626 | Defendant and 100% owner of defendants EJ Global, LLC and Pretty Mess, Inc. Erika Girardi will be called as an adverse witness. She will be asked to testify as to: (1) her relationship with Thomas Girardi; (2) her entertainment career, (3) payment of vendor billings incurred by Defendant EJ Global, (4) payment for charges she incurred on her American Express card (5) relationship between with the Girardi Keese law firm and payments made to satisfy charges she made using her American Express Card (6) her management of EJ Global and Pretty Mess Inc., (6) her applying for a | 4 Hours | *Defendants* (for redirect if Plaintiff calls as adverse witness; and for direct in defendants' case):<br><br>**4 Hours** | |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| | California Gaming License; (7) her business relationship with Christopher Psaila and Marco Morante ("Morante") and their costume design company, Marco Marco; (8) her claim that Marco Marco fraudulently charged her American Express Card and her initiating criminal proceedings against Psaila and Morante. | | | |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| Marco Morante<br><br>c/o Bruce Bealke<br>77 W Wacker Dr.<br>Suite 45001<br>Chicago IL 60601<br>Telephone: (310) 562-6856 | Relationship with Erika Girardi, charges made against Erika Girardi's American Express card. | 1 Hour | .75 Hour<br>Objection. Mr. Morante is newly listed by Plaintiff. Plaintiff did not list Mr. Morante on Rule 16 disclosures or discovery responses. Subject matter raises collateral issues requiring mini-trial. If Plaintiff permitted to call Mr. Morante, Defendants request leave to take his deposition and obtain documents from him at the deposition. | |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| Peter Grimm<br><br>Telephone #<br><br>Cell: 310.429.0672<br>Office: 954.217.7870<br><br>Address:<br>American Express Offices<br>3579 E. Foothill #189<br>Pasadena, CA 91107 | American Express investigation pertaining to allegations made by Erika Girardi re fraudulent charges made by Marco Marco | 1 Hour | .75 Hour<br><br>Objection. Mr. Grimm is newly listed by Plaintiff. Plaintiff did not list Mr. Grimm on Rule 16 disclosures or discovery responses. Subject matter raises collateral issues requiring mini-trial. If Plaintiff permitted to call Mr. Grimm, Defendants request leave to take his deposition and obtain documents from him at the deposition. | |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

## B.  Defendants' Witness List

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| Laia Ribatallada 949-383-2860 c/o Evan C. Borges Greenberg Gross LLP 650 Town Center Dr., Ste 1700, Costa Mesa, CA 92626 | Ms. Girardi's personal assistant.  Will testify regarding business of EJ Global LLC and Pretty Mess, Inc. | *Defendants*: .5 Hour | *Plaintiff*: .5 Hour | |
| Mikey Minden 949-383-2860 c/o Evan C. Borges Greenberg Gross LLP 650 Town Center Dr., Ste 1700, Costa Mesa, CA 92626 | Choreographer for EJ Global LLC, and Pretty Mess, Inc.  Will testify regarding business of EJ Global LLC and Pretty Mess, Inc. | .25 Hour | .5 Hour | |
| Michael Ullman 310-278-9000 Platinum Financial Management, Inc. 9200 Sunset Boulevard, Ste 600, Los Angeles, CA 90069 | Ms. Girardi's business manager; Mr. Ullman will testify regarding Ms. Girardi's post-divorce filing business affairs, EJ Global LLC, Pretty Mess, Inc., and tax issues. | 1 Hour | .5 Hour | |
| Michele Weiss 310-550-6200 Holtz, Slavett, Drabkin & Warner 10940 Wilshire Blvd, Ste 2000, Los Angeles, CA 90024 | Ms. Girardi's tax attorney; Ms. Weiss will testify regarding Ms. Girardi's post-divorce filing business affairs, IRS and FTB tax issues, and EJ Global LLC. | 1 Hour | .5 Hour | |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| Donald P. Eppich 760-599-9900 Magnus Blue, LLC 100 E. San Marcos Blvd., Ste 100, San Marcos, CA 92069 | Outside accountant retained by Tom Girardi for GK, EJ Global LLC, and Tom and Erika Girardi finances, tax issues, and tax return preparation. Mr. Eppich is expected to testify regarding these subjects. | Calling as adverse witness. **1 Hour** | **.5 Hour** | |
| Custodian of Records, Polito, Eppich Associates, LLP | | **0.25 Hour** | **0.0 Hour** | |
| Phillip Baker 213-241-0900 Baker, Keener & Nahra 633 West Fifth St., Ste 5500, Los Angeles, CA 90071 | Attorney for Ms. Girardi in Stillwell Madison litigation; Mr. Baker is expected to testify regarding communications with Ms. Girardi about EJ Global LLC, Tom Girardi, and the married couple's finances. | **.75 Hour** | **.5 Hour** | |
| Joy Fernbeck Harn 562-264-0266 100 Oceangate, Ste 1100, Long Beach, CA 90802 | Gambling license for Bicycle Club and withdrawal transactions between 2014 and 2019. | **1 Hour** | **.5 Hour** | |

JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER

| Witness's Name,* Phone Number, Address | Summary of Testimony / Why Testimony Unique | Time for Direct Exam (Hours) | Time for Cross Exam (Hours) | Date(s) of Testimony |
|---|---|---|---|---|
| Custodian of Records, Joy Fernback Harn, APC | | **0.25 Hour** | **0.0 Hour** | |

Dated:  May 15, 2026

Respectfully submitted,

JENKINS MULLIGAN & GABRIEL, LLP

By:_____

    Larry W. Gabriel

BEALKE LAW

By:_____

    Bruce Bealke
Attorneys for Plaintiff LHA Land, LLC

DATED:  May 15, 2026

GREENBERG GROSS LLP

By: _____
    Evan C. Borges

Attorneys for Defendants Erika Girardi, EJ Global, LLC, and Pretty Mess, Inc.

-51-
JOINT FINAL PRETRIAL CONFERENCE [PROPOSED] ORDER