LARRY W. GABRIEL [SBN  68329]
 lgabrielaw@outlook.com
JENKINS MULLIGAN & GABRIEL LLP
5743 Corsa Avenue, Suite 110
Westlake Village, California 91361
Telephone: (818) 943-8992

BRUCE BERNARD BEALKE [IL.SNB 6200543]
[Pro Hac Vice]
Bealkelaw@protonmail.com
77 W Wacker Dr.
Suite 45001
Chicago IL 60601
Telephone: (310) 562-6856

Attorneys for Plaintiff LHA Land, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| LHA LAND, LLC, a Colorado limited liability company, as successor-in-interest to and assignee of Elissa D. Miller, Chapter 7 Trustee of Bankruptcy Debtor Girardi Keese,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ERIKA N. GIRARDI, an individual; EJ GLOBAL, LLC, a limited liability company; and PRETTY MESS, INC., a corporation,<br><br>　　　　Defendants. | Case No. 2:25-cv-01038-AH<br><br>**PLAINTIFF-ASSIGNEES REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE PLAINTIFF'S CLAIMS FOR (1) CONSTRUCTIVE TRUST (FIFTH CLAIM FOR RELIEF) AND UNJUST ENRICHMENT (FOURTEENTH CLAIM FOR RELIEF).**<br><br>**[PROPOSED]**<br><br>Trial Date:　　May 26, 2026<br><br>**Final Pre-Trial Conference [L.R. 16]**<br>Date:　　May 21, 2026<br>Time:　　1:30 p.m.<br><br>**Judge:  Hon. Anne Hwang**<br>Place:　　Courtroom 9C, 9th Floor<br>United States District Court<br>350 W. 1st Street. Los Angeles. CA |

Plaintiff-assignee, LHA Land LLC, ("**Plaintiff**" or "**LHA**") submits the following Finding of Fact and Conclusions of Law [Proposed] for the Court's consideration.

## I.    INTRODUCTION AND SUMMARY OF THE CASE

This proceeding arises from transfers made by the now debtor law firm Girardi Keesee ("**GK**")  between 2007 and 2020 totaling $25,592,261.26 (the "Transfers") for the benefit of Defendant Erika Girardi ("Erika") and her controlled entity, Defendant EJ Global, LLC ("EJ Global"). By this action, LHA seeks equitable relief, including unjust enrichment and the imposition of a constructive trust, given Defendants' receipt and retention of benefits obtained from fraudulent Transfers wrongfully diverted from GK.

That the Transfers were made as part of GK's managing partner (Erika Girardi's husband) Thomas Girardi ("**Girardi**") and GK CFO Christopher Kamon ("**Kamon**") massive Ponzi-like fraud scheme is a factual certainty. On January 31, 2023, Girardi  and Kamon were indicted on five counts of wire fraud in *United States v. Girardi, et al.* Cr. No. 23-00047, Central District CA ("**Indictment**"). As charged in the Indictment, between 2010 (if not before) and 2020, Girardi and Kamon operated GK through a long-running scheme pursuant to which they misappropriate millions of dollars in client settlement funds and other monies entrusted to the firm. Girardi caused GK to use client trust funds owed to certain clients to pay insiders and other obligations, including formr clients who funds were previously misappropriated  by Girardi and Kamon while concealing chronic shortfalls through commingling and improper disbursements. During this same period, Girardi directed GK to make over $25 million in Transfers for the benefit of Erika and EJ Global.

On August 27, 2024 after a jury trial on the indictment, Girardi was found guilty on all counts of the indictment that were submitted to the jury. On October 8, 2024, the United States Attorney for the Central District and Kamon entered into a plea agreement pursuant to which Kamon pleaded guilty to one wire fraud count of a criminal Information filed against him in *United States v. Kamon*, Cr. No. 23-00024, Central

District of CA and one wire fraud count of the indictment in *United States v. Girardi, et al.* Cr. No. 23-00047. In his plea agreement Kamon admitted to Girardi's fraudulent scheme stating in detail how and why the fraudulent transfers were made.

As demonstrated by the persistent misuse of entrusted client funds, GK lacked sufficient legitimate funds to support these Transfers. Erika and EJ Global nevertheless received and retained the benefits obtained from the fraudulent transfers, including funds used to pay Erika's personal expenses, support her entertainment career, purchase millions of dollars in clothing and jewelry and finance EJ Global's operations. These Transfers conferred substantial benefits upon Defendants at the expense of GK's creditors and defrauded clients for which Defendants gave no consideration whatsoever.

Under these circumstances, equity and good conscience require restitution. Defendants were unjustly enriched by their receipt and retention of benefits obtained through the fraudulent transfers, and it would be inequitable to permit Defendants to retain those benefits. The Trustee therefore seeks restitutionary relief and the imposition of a constructive trust over all identifiable proceeds, assets, and benefits derived from the Transfers.

## II.   FINDINGS OF FACT

### A.   GK Bankruptcy

| No. | Statement of Facts | Evidence |
|---|---|---|
| 1. | The GK bankruptcy was initiated by the filing of an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code on December 18, 2020. *In re Girardi Keese,* Bankr. C.D. Cal, Case No.: 2:20-bk-21022-BR. | Bankr. Dkt. # 1 |
| 2. | An order for relief was entered on January 13, 2021. | Bankr. Dkt # 69 |

| | | |
|---|---|---|
| 3. | On January 5, 2022, the Internal Revenue Service filed a claim against the GK estate in the amount of $51,631.17. The IRS filed an Amended Proof of Claim on September 9, 2024 claiming a debt owed in the amount of $54,571.17. | Plaintiff (π) Exhibit (Ex.) 45, GK Claim Docket, Claim No. 161-1; Claim No. 161-2. |

**B.    The Pleadings**

| | | |
|---|---|---|
| 4. | On August 26, 2021, the Trustee filed her First Amended Complaint ("**FAC**") | Π's Ex. 1., Adv. Dkt. # 12 |
| 5. | Defendants filed their Answer to the FAC on November 11, 2021. | Π's Ex. 2, Adv. Dkt. # 20. |
| 6. | The Answer sets forth 16 Affirmative Defenses. | Id., Π's Ex. 2. |

**C.  The Parties**

| | | |
|---|---|---|
| 7. | Plaintiff LHA Land, LLC, a Colorado limited liability company ("**Plaintiff**"), in its capacity as successor-in-interest to and assignee of Elissa D. Miller, chapter 7 trustee (the "Trustee") of bankruptcy debtor Girardi Keese ("**GK**"), substituted into this action as plaintiff in place and stead of the Trustee pursuant to this Court's Order of May 5, 2026 | DC Dkt. # 100. |
| 8. | Defendant Erika Girardi ("**Erika**") is an individual who resides and has conducted business withing the jurisdiction of this Court. | Π's Ex. 2, Answer,  p. 2, ¶ 4:26-27. |
| 9. | Defendant EJ Global, LLC, ("**EJ Global**") is a California limited liability company. | Π's Ex. 2, Answer,  p. 3, ¶ 5:1-2. |

| | | |
|---|---|---|
| 10. | Defendant Pretty Mess Inc., ("**PMI**") is a California corporation formed in early 2021. | Π's Ex. 2, Answer, p. 3, ¶ 6:9-10. |

**D. Erika's Background**

| | | |
|---|---|---|
| 11. | Erika was born in Atlanta Georgia. | Π's Ex. 8, Erika Deposition Tr. Oct. 19, 2022 at P.9:11. |
| 12. | Erika' birth last name was Cahloy | Π's Ex. 9, Book: "Erika Jane-Pretty Mess" attached to Erika Deposition Tr. Oct. 19, 2022, Ex. 5. |
| 13. | Erika graduated from High School | Π's Ex. 8, Erika Deposition Tr. Oct. 19, 2022 at 15. |
| 14. | Erika started to work in the entertainment field after High School. | Id., 21-22 |
| 15. | Erika moved to New York City. | Id., 23-24 |
| 16. | Married Thomas Zizzo | Id., at 10:8-12 |
| 17. | Had one child, Thomas Zizzo Jr. | Id., at 10:11-15. |
| 18. | In 1995, Erika moved to Los Angeles | Id., 10:3-4 |
| 19. | Ericka divorced Mr. Zizzo in 1996. | Id., 10:24-25 |
| 20. | Here first job in California was working at a clothing store. | Id., 11:4-6 |
| 21. | Erika then went to work at Chasen's restaurant. | Id.,11: 7-8 |
| 22. | Erika met Thomas Girardi ("**Girardi**") while working at Chasen's. | Id., 11: 10-11 |

| 23. | Erika and Girardi married in January 2000. | Id., 12:5-7. |
|---|---|---|
| 24. | For the next seven years, Erika did not work. "Now after you got married, you did not work for seven years; is that right? A   That is correct." | Id., 11:14-17. |

### E.  Thomas V. Girardi Background

| 25. | Girardi was admitted to practice in the State of California on January 31, 1965. | Π's Ex. 55, State Bar Attorney Profile Thomas Vicent Girardi, State Bar # 36603 |
|---|---|---|
| 26. | At all times relevant Girardi was a partner in the law firm, Girardi Keese ("**GK**"). | Id. |
| 27. | Girardi through GK practice focused on representing plaintiffs on a contingency fee base. | Π's Ex. 7, EG Depo. Tr. August 4, 2022, ("August Depo") at p. 227:10-19. |
| 28. | On November 11, 2021, the California State Bar filed its Petition for Disbarment After Default for Failure to File Timely Response; Supporting Declaration of Eli D. Morgenstern, in In the Matter of  Thomas Vincent Girardi, State Bar No. 36603, Case No. SBC-21-O-30192-YDR. | Π's Ex. 54, |
| 29. | Girardi was disbarred by the California Supreme Court on July 1, 2022. | Π's Ex. 56. State Bar Court No. SBC-21-O-30192 |

### G.  Erika's Formation, Ownership and Management of EJ Global

| 30. | In 2008, Erika caused to be formed  EJ Global based upon the advice of Tom Girardi.<br><br>"In your August 4 deposition you testified that Tom Girardi formed the corporation?<br>A Yes.<br>Q And was he the one that advised you to form the company?<br>74irardi's advice.<br>A. Yes. | Id., at p. 74-75 :21-1 |
|---|---|---|
| 31. | Erika's purpose for forming EJ Global was to provide a business structure for her recording, performing and merchandise activities.<br>"Q Was there a specific purpose for the company, other than having your own business?<br>A Well, at the time -- you know, and I still record, so it was my recording, my performing, my merch?<br>Q Sorry?<br>A My merchandise, my tour, so it was sort of everything underneath that." | Id., at p. 75:5-1 |
| 32. | Erika's performance contracts were not always in the name of EJ Global, some could have been in the of Erika Girardi.<br>"Q All of your contracts were signed for EJ Global? A Sometimes they were probably -- I don't know. They could have been Erika Girardi as well. Depended. But my company was EJ Global." | Π's Ex. 8, at p. 75:12-19 |
| 33. | Erika was the sole member of EJ Global. | Π's Ex. 2, |

| | | |
|---|---|---|
| | Q. Okay. That's pretty much it. But there were no other members of the LLC of EJ Global; correct? <br> A. Correct. | Answer, at p.3 ¶ 5:1-2; <br> Π's Ex. 8, p. 77:2-4. |
| 34. | There was no minute book for EJ Global. <br> "Q. Did you keep a minute book -- <br> A. No. <br> Q. I guess I should do it as a complete sentence. <br> for EJ Global? <br> A. No. <br> "Did you ever have any documents written up about things that the company was doing as far as confirming corporate activities or business activities? <br> A. No." | Π's Ex. 8, p. 77:5-6. <br><br><br><br><br> Π's Ex. 7, p. 77:18-21 |
| 35. | No start-up capital was put into EJ Global. <br> "Q. When the company was first formed, there's such a thing as putting money into the company. Did you put capital -- we call that capital. Did you put capital into the company? <br> A. Not that I know of." | Π's Ex. 8, p. 78:3-7. |
| 36. | Erika had no interest in understanding the EJ Global operating agreement and did not read it. <br> Q. Did you have an interest in understanding what this operating agreement meant for you? <br> A. Not really, no. I mean, I signed it. | Ex. 7, p. 73:15-17. |
| 37. | EJ Global business operations were tasked to GK bookkeeper Norina Rouillard, an employee at GK. <br> "Q. Who were the accountants for the company? | Ex. 8, p. 78:8-17. |

A. The law firm would be the immediate accountant, so that would be Norina Rouillard.

Q. That's N-o-r-i-n-a?

A. Yes.

Q. R-o-u-i-l-l-a-r-d. She was a bookkeeper at Girardi Keese?

A. Yes. Yes.

Q. She did all of your books?

A. I'm assuming, yeah.

| | | |
|---|---|---|
| 38. | Outside accountants, Polito Eppich prepared EJ Global and Erika and Girardi's tax returns.<br><br>"THE WITNESS: And then the other accountants that worked there and I guess our outside accountants or Tom's outside accountants, Polito Eppich or Epich Polito." | Id., at p. 78:22-25-17 |
| 39. | Erika did not have a business manager until 2020.<br><br>"Q. Did you have a business manager?<br>A. No.<br>Q Did you ever have a business manager?<br>Q Up until 2020?<br>A No." | Id., at p. 80-81:25-8. |
| 40. | GK's managed the financial affairs of EJ Global, maintained EJ Global's financial records and, in conjunction with outside accountants, prepared EJ Global's tax returns. | Π's Ex. 2, Answer, p.4, ¶ 5:1-2. |
| 41. | GK  managed all EJ Global and Erika's book and records, including all ledgers, and invoices. | Π's Ex. 7, Depo.Tr.  at p. 79:11-21 |

| | | |
|---|---|---|
| 42. | Erika never thought about the money it cost to operate her career  or what would happen to the profits.<br>    I didn't really - - I just thought that it would all be taken<br>        care of.  I  didn't really ask. Like, it's not like I was<br>        raking in millions of bucks . . ." | Π's Ex. 7,<br>Depo Tr. p.81-82:20-1 |
| 43. | Erika knew that the bills were going (Girardi Keese) but didn't know how they were paid.<br>"Q I agree, eventually, from other sources, you<br>started making more money, but I'm talking before the<br>end, let's say from 2008 to 2019, there was -- I'll<br>represent to you there was millions of dollars going<br>out toward this music career. And did you have an<br>understanding of why the law firm was doing this?<br>THE WITNESS: Thank you. I don't know that I knew that. I<br>mean, I -- oh, I'll represent to you, like I told you earlier,<br>when I came home and I said, I want to do this, and Tom said<br>okay. So I don't know where the bills were -- I knew where<br>they were going, but I don't know how they were paid. I don't<br>know how they were paid." | Id., at 83-84:23-1 |
| 44. | Erika did not know how much it was costing for her entertainment career.<br>"Q Well, did you know how much it was costing for the<br>operation of EJ Global?<br>THE WITNESS: Not really." | Id., at 84: 3-7 |
| 45. | In the first few years, Erika never really paid attention to | Id., at 96:3-6 |

| | | |
|---|---|---|
| | whether she was profitable or not because she was out there creating and working and doing things.<br><br>"I'm going to try this a different way. In 2008, do you know how much the law firm approximately spent on EJ Global?<br><br>A No.<br><br>Q You have no idea of any amounts; right?<br><br>A 2008, no.<br><br>Q 2008.<br><br>A No.<br><br>Q What about, any year, do you have a recollection of the law firm spending money on EJ Global?<br><br>A I don't know, again, how Tom Girardi paid these bills. I don't know whether he ran it throughGirardi Keese or whether he paid it personally." | |
| 46. | Erika never saw the vendor bills.<br><br>"Q I'm trying to, though, figure out did you even know -- you would say you'd give him bills. Did you ever know what the total of those bills added up to?<br><br>A I never really even saw them. The vendors would send them directly to the firm." | Id., at 85:2-7 |
| 47. | She trusted everyone else. As to whether a net loss or not, all she knew was that she was making music and putting it up for sale.<br><br>"But I'm just asking you do you know -- I'll ask a | Id., at 95-96:22-8 |

| | | |
|---|---|---|
| | foundational question. Do you know whether the business made money or lost money from 2008 to the present day? THE WITNESS: In the first few years, you know -- here's the whole thing. I never really paid attention because I was out there creating and  working and doing things. So I trusted everyone else. A net loss, you know, I mean, all I knew is I was making music and putting it up for sale." | |
| 48. | Erika never thought about the profitability of EJ Global and thought that GK would take care of it. "Q Okay. This person at the firm is basically doing all the books for your music company; is that fair to say? A Yes. Q Okay. Did -- was Girardi Keese entitled to the money that you would make from the music company? A I never really thought of it." | Id., at p. 81:10-16 |
| 49. | Erika had accessed the information as to her American Express charges payments and EJ Global vendor billings and payments through Norina Rouillard, the accounts payable person at  GK, who took care of paying Erika and EJ Global's invoices and accounting.     Q Okay. So from 2008 --     A Up until then --     Q -- if you have a question about anything, she     would be the person that you would call?     THE WITNESS: I would call the firm and more | Π's Ex. 7, Depo. Tr. at p.79-80:17-3. |

| | | |
|---|---|---|
| than likely they would refer me down to accounting.<br><br>Q So I guess what I'm getting at, was there anybody<br><br>else at the firm that you dealt with regarding<br><br>he finances of EJ Global other than Norina?<br><br>A No. | | |

**F. Erika's Restart of a Career in the Entertainment Field and Her Use of Girardi's American Express Credit Card Account.**

| | | |
|---|---|---|
| 50. | In or around 2077-2008 Erika decided to restart her entertainment career.<br><br>"Around 2007, I decided to reignite my singing career. I began to perform at nightclubs around the country, primarily for an LGBTIQA+ audience. As part of building my image as "Erika Jayne," I would wear fun, playful, and sparkly outfits for my performances." | Π's Ex. 8,<br><br>Erika Deposition Tr. Oct. 19, 2022 at 28:12-19.<br>Π's Ex. 49, ¶ 6.<br><br>Declaration of Erika Girardi in Support of Defendants' Special Motion to Strike Plaintiff's Complaint Pursuant to Code of Civil Procedure Section 425.16 filed in the case, Christopher Psaila v. Erika Girardi et al., Case No. 2:23-cv-07120-MWF Dkt. # 25-1. (**"Erika Decl."**) |
| 51. | Shortly thereafter Girardi provided Erika with American Express credit cards in her name. | Π's Ex. 49,<br><br>Erika Decl. ¶ 7 |

| | | |
|---|---|---|
| | "Thomas Girardi gave me an American Express ("Amex") credit card  during our credit card, (*sic*) including for the purposes of re-starting my singing and performing career." | See also, Π's Ex. 8, Erika Deposition Tr. Oct. 19, 2022 at 16:11-15; |
| 52. | Erika's American Express charges were paid at GK. "I did not know how much I spent per month or per year. Girardi Keese paid my Amex credit card bill every month." | Π's Ex. 49, Erika Decl. ¶ 8. Π's Ex. 7, Erika Deposition Tr.  Aug. 4, 2022 at p. 121:10-21. |
| 53. | Erika could have had access to her AMEX account at any time but choose not to until September 16, 2016: Sometime in 2016, TG began to complain to me on multiple occasions that I was spending too much on my Amex card. "About a month later, TG again complained to me again about supposedly high and excessive Amex charges. I asked for specifics but received none. Based on my husband's complaints, I decided to try and get access to my Amex account. In September 2016, I called Amex but could not provide security information because I did not know it. The Amex customer service agent reassured me that she recognized my voice from watching *The Real* | Π's Ex. 49, Erika Decl. ¶¶ 22-28. |

|  | *Housewives of Beverly Hills* and gave me access to the AMEX account. Subsequently, on September 19, 2016, I received an email from AMEX confirming my recent enrollment for online access to my account." | |

**H. The Transfers Made by Girardi Keese for the Benefit of Erika Girardi and EJ Global**

| | | |
|---|---|---|
| 54. | From 2008 to 2020, the Debtor made net payments totaling at least $25,742,261.26 for the benefit of the Defendants, (the "Transfers"). | Π's Ex. 15, Expert Witness Report, Thomas P. Jeremissen, p. 4:21-22 |
| 55. | GK made net payments totaling at least $14,259,012.84 to American Express for charges benefitting the Defendants made on credit cards issued on Thomas V. Girardi's personal American Express account, including cards issued in Erika's name. | Id., at p. 4:19-25 |
| 56. | GK made net payments totaling at least $11,483,248.42 for other obligations of the Defendants. | Id., at p. 4:19-27 |
| 57. | From 2008-2020, the Debtor received a payment of $150,000 from the Defendants. | Id., at p. 5:1-2 |
| 58. | As of the date of the Debtor's bankruptcy filing (December 18, 2020) the Debtor's books and records reflect a receivable due from EJ Global in the amount of $25,582,261.26 resulting | Id., at p. 5:3-8 |

| | | |
|---|---|---|
| | from the payments made by the Debtor for the benefit of the Defendants, less the payment made by the Defendants to the Debtor. The total amount of money the Debtor paid to American Express for charges incurred by Erika Girardi from 2008 through 2020 is: $14,259,012.84. | |
| 59. | The Transfers were consistently characterized and accounted for as debt allegedly owed only by EJ Global. | Id., at p. 5:9-10 |
| 60. | From 2008 through 2020, GK paid $25,592,261.26 in satisfaction of Erika Girardi's personal American Express charges and EJ Global's third-party vendor invoices. | Id., Π's Ex. 2, Ex. E. |
| 61. | GK's books and records reflect an account receivable in the amount of $25,592,261.26 allegedly owed by EJ Global, consisting of more than 13,000 transactions from December 2008 through June 2020. | Π's Ex. 15, Expert Witness Report, Thomas P. Jeremiassen. |
| 62. | During the approximately 11.5 years this receivable account was active, EJ Global made only one payment to GK— $150,000 in October 2019—when the account balance exceeded $25.5 million. | Id. |
| 63. | Between December 24, 2013 through June 22, 2020, GK paid $7,190,287.42 in American Express Charges incurred by Erika. | Π's Ex. 17 Recap of charges paid to American Express 2013-2020. |

## I. Erika's Reliance on Girardi and Accountants to Prepare Tax Returns

| | | |
|---|---|---|
| 64. | GK and Thomas Girardi also managed the personal finances of Thomas and Erika Girardi during their marriage in | Π's Ex. 2, |

| | | |
|---|---|---|
| | conjunction with outside accountants, prepared their joint tax returns. | Answer, p.4 ¶ 5: 5-7 |
| 65. | Erika trusted GK, Thomas Girardi, and outside accountants—based on their superior knowledge and expertise—to prepare proper, lawful, and legitimate tax returns. | Π's Ex. 2, Answer, p.11, ¶ 21: 16-18, |
| 66. | No one prevented Erika from reviewing the document or asking questions. | Π's Ex. 7, Erika Depo. Tr. at p. 63:21-23 |
| 67. | Erika signed married-filing-joint tax returns throughout her marriage to Thomas Girardi. | Π's Ex. 2, Answer. p. 11, ¶ 22:20-22 |
| 68. | Erika relied on GK, Thomas Girardi, and outside accountants to handle all financial accounting and tax characterization matters. | Π's Ex. 2, Answer, p. 11, ¶ 5-6. p. 2:1-17 |
| 69. | Erika typically signed documents without reading them, if Girardi gave them to her. | Π's Ex. 7 Erika Depo. Tr. at p. 63:21-23 |
| 70. | No one prevented Erika from reviewing the document or asking questions | Π's Ex. 7 Erika Depo. Tr. p. 63:21-23 |
| 71. | Erika was not concerned about her signing documents without reading them because she trusted Girardi. | Id., p. 63-64:21-1 |
| 72. | No one prevented Erika from directly calling any of the people who were preparing Erika and Girardi's tax returns to ask questions. | Id. at p. 68:12-25 |

## J. Pretty Mess, Inc.

| | | |
|---|---|---|
| 73. | Pretty Mess, Inc. ("PMI") was formed in early 2021 and is a corporation owned by Ms. Girardi. | Π's Ex. 2, Answer, p.3,¶ 6:9-10: Π's Ex. 4, Articles of Incorporation Pretty Mess, Inc. |
| 74. | PMI is owed by Erika. | Π's Ex. 2, Answer, p.3,¶ 6:10-11. |
| 75. | PMI was formed so that Erikc business would be her separate property. | Π's Ex. 2, Answer, p.3,¶ 6:11-13 |

## K. GK's Trust Accounting Practices, Commingling, and Insolvency

| | | |
|---|---|---|
| 76. | On October 23, 2024, the GK Bankruptcy Court  issued its Findings of Fact and Conclusions of Law in the case *Miller v. Erika Girardi,* Adv. Case No. 2:21-ap-01155-BR. Set forth below are the Bankruptcy Findings of Fact germane to this litigation: | Π's Ex. 46 Findings & Conclusions issued in *Miller v. Erika Girardi etc al.,* Adv. Case No. 2:21-ap-01155-BR, Dkt. # 137 |
| 77. | In 2007 GK maintained its primary client IOLTA trust account at Comerica Bank, Account No. ending in 6674. | Id., FF # 38; Π's Ex. 16, Expert Report and Declaration of Nicholas R. Troszak, executed October 24, 2023 |
| 78. | Between January 14, 2002, to January 29, 2007 (the day prior to the receipt of the Rezulin settlement funds) deposits were | Id., FF # 40; Π's Ex. 16. |

| | | |
|---|---|---|
| | made into the Comerica IOLTA in the amount of $17,631,673.00 attributable to Thomas V. Girardi ("TVG") or his related or affiliated entities. | |
| 79. | During the time period April 22, 2002, through December 31, 2010, $29,131,673.47 was deposited into the Comerica IOLTA Account # 6674 that were credited as deposits made by Thomas V. Girardi ("TVG"), or as a TVG loan, or accounted for under the case number 10001, the case number used for Girardi personal transactions. | Π's Ex. 46, FF # 41. Π's Ex. 16, Expert Report and Declaration of Nicholas R. Troszak, executed October 24.2023. |
| 80. | During the same time period (April 22, 2002, through December 31, 2010), $31,579,332.25 was disbursed from the Comerica IOLTA Account # 6674 described as payments made to TVG, TVG loan, or accounted for under the case number of 10001, the case number used for Girardi personal transactions. | Π's Ex. 46, FF # 42, Π's Ex. 16, Expert Report and Declaration of Nicholas R. Troszak, executed October 24.2023. |
| 81. | The differential between the payments in and payments out of the Comerica IOLTA Account # 6674 attributable to TVG is a negative $ 2,447,658.78. None of the transactions in this calculation were described as a payment for fees or costs. | Π's Ex. 46, FF # 43, Π's Ex. 16, Expert Report and Declaration of Nicholas R. Troszak, executed October 24.2023. |
| 82. | For the period of time between January 30, 2007, (the date the first settlement payment on the Rezulin matter was received) through October 27, 2014 (the date of the last payment attributable to Rezulin), checks were issued to G&L Aviation, an entity owned by TVG and Walter Lack. The total amount | Π's Ex. 46, FF # 44, Π's Ex. 16, Expert Report and Declaration of Nicholas R. Troszak. |

| | | |
|---|---|---|
| | paid to G&L Aviation was $2,082,849.59. Two of the four payments are accounted for as relating to TVG and GK miscellaneous. The remaining two payments are accounted for as relating to certain GK client cases. | executed October 24,2023, Exs. 2-3. |
| 83. | The following payments were made directly from the Comerica IOLTA Account # 6674 prior the receipt of the Rezulin settlement funds:<br><br>a. Check # 40420 dated 4/26/05 payable to G&L Aviation in the amount of $500,000.00.<br><br>b. Check # 13916 dated 06/22/06 payable to G&L Aviation in the amount of $750,000.00.<br><br>c. Check # 13917 dated 06/22/06 payable to Pac Ten Scott Road Associates LLC in the amount of $3,200,000.00. | Π's Ex. 46,<br>FF # 45,<br>Π's Ex. 16,<br>Expert Report and Declaration of Nicholas R. Troszak, executed October 24,2023, Ex. 3. |
| 84. | On January 30, 2007, a wire transfer deposit was credited to the IOLTA Comerica Trust Account # 6674 in the amount of $64,845,728.14 (January 30, 2007 Deposit"). The description for the deposit, Rezulin Settlement Proceeds. | Π's Ex. 46, F<br>F # 46,<br>Π's Ex. 16,<br>Expert Report and Declaration of Nicholas R. Troszak, executed August 15, 2024, Exhibit 7.1<br>Trust Account System (Comerica Trust 6674) Activity Register, p. 193. |
| 85. | Prior to the Rezulin Settlement Funds deposit, the IOLTA Comerica Trust Account # 6674 had a positive balance of | Π's Ex. 46,<br>FF # 47 |

| | | |
|---|---|---|
| | $2,237,179.62. | |
| 86. | After receipt of the January 30, 2007 deposit, the IOLTA Comerica Trust Account # 6674 had a positive balance of $67,082,907.76. | Π's Ex. 46, FF # 48. |
| 87. | On January 30, 2007, Girardi Keese withdrew $4 million from the IOLTA Comerica Trust Account # 6674 as reimbursements for costs attributable to Rezulin matter. | Π's Ex. 46, FF # 49; Π's Ex. 16,, Expert Report and Declaration of Nicholas R. Troszak executed August 15, 2024, Exhibit 7.1, Comerica IOLTA Register, at p. 571; Exhibit 5, p.1. 49, |
| 88. | From 2002 through 2013, GK deposited and disbursed tens of millions of dollars through the Comerica IOLTA in transactions coded to Thomas Girardi's personal case number, resulting in a net negative balance exceeding $2.4 million attributable to Girardi and not recorded as fees or costs. | Π's Ex. 16, Expert Report and Declaration of Nicholas R. Troszak |
| 89. | On March 2, 2007, a check was drawn against the (GK) IOLTA Comerica Trust Account # 6674 payable to M&M in the amount of $750,000. The description for the check, "Costs" relating to GK case name *Rezulin,* case number 21101. | Π's Ex. 46, FF # 51. |

| | | |
|---|---|---|
| 90. | The check made payable to M&M was used to purchase a pair of diamond earrings for Erika Girardi. | Π's Ex. 46, FF # 52, |
| 91. | Depending on the period of time, many Girardi Keese client accounts were out of trust. As presented in Mr. Troszak's Supp. Decl. (Exhibit 2, page 1) case 29048 *Estate of Mong Qui Sun v DW Tours* was negative in the amount of $4,875,000 (Grand Total "net" negative amount of $7,094,900); case 21101 *Rezulin* was negative in the amount of $2,831,788 (Grand total "net" negative amount of $2,833,663); and, case 25198 *Bextra/Celebrex* was negative in the amount of $1,233,620 (Grand total "net" negative amount of $1,851,279). | Π's Ex. 46, FF # 56. |
| 92. | During the time period (January 1, 2002, through November 30, 2013), there are 68 total transactions (16 deposits and 52 disbursements), which indicate commingling of personal TVG funds and disbursements of client trust funds for the benefit of TVG. The transactions are accounted for as associated or relating to TVG under the case number "10001," case name "TVG," or includes TVG within the transaction description. The Trust Database accounting records indicate 16 deposits totaling $29,680,472 relating to TVG and 52 disbursements totaling $45,079,332 relating to TVG during this period. | Π's Ex. 46, FF # 57. |
| 93. | From the settlements reached in the Rezulin matter, case number 21101, a total of $66,380,270 in deposits were received, and a total of $69,213,933 of disbursements were | Π's Ex. 46, FF # 58. |

| | | |
|---|---|---|
| | made and assigned to the Rezulin matter. The disbursements assigned to the Rezulin matter exceeded the deposits assigned to the Rezulin matter by $2,833,663. | |
| 94. | All cash transactions for the Rezulin matter, into or out of the IOLTA Comerica Trust Account # 6674 occurred between January 1, 2002, through November 30, 2013, except for two transactions totaling $1,825 in disbursements, which took place during 2014. | Π's Ex. 46, FF # 59. |
| 95. | During the period April 22, 2002, through January 2018, $17,631,673 was deposited into the IOLTA Comerica Trust Account # 6674 relating to Girardi or Girardi related entities; and, $21,479,073 was disbursed from the IOLTA Comerica Trust Account # 6674 relating to Girardi or Girardi related entities. | Π's Ex. 46, FF # 61. |
| 96. | There were 90 GK client cases that have a "net" negative balance totaling $24,682,028. For example, the 99140 Friendly Valley matter has a "net" negative balance of $4,429,524 (Exhibit 7, page 1). The "net" negative balance decreases to $4,375,522, when including all other Girardi Keese trust accounts. Also, the 21101 Rezulin matter has a "net" negative balance of $ 2,833,662.83. | Π's Ex. 46, FF # 62. |
| 97. | Between January 30, 2007 (the date the first settlement payment on the Rezulin matter was received) through October 27, 2014 (the date of the last payment attributable to Rezulin), Girardi Keese issued checks to G&L Aviation, an entity owned by TVG and Walter Lack from the IOLTA | Π's Ex. 46, FF # 63. |

| | | | |
|---|---|---|---|
| | | Comerica Trust Account # 6674 in the total amount of $2,082,849.59. | |
| | 98. | Between July 2006 through December 2008, 42 payments from Magnet Consulting Inc. were deposited into the IOLTA Comerica Trust Account # 6674 in the amount of $2,580,000.00. These deposits were accounted for under accounts "10004 Exchange -s/b zero balance" and "10208 MISCELLANEOUS (2008)." | Π's Ex. 46, FF # 64. |
| | 99. | During the same approximate time period (July 2006 through December 2008) Girardi Keese issued 40 checks from the IOLTA Comerica Trust Account # 6674 totaling $2,580,000 payable to Girardi Financial, Inc., for the same amounts (except for the initial payment to Girardi Financial, Inc., in the amount of $240,000) as the money received from Magnet Consulting Inc. These disbursements were accounted for similarly to the Magnet Consulting deposits, under accounts "10004 Exchange -s/b zero balance" and "10208 MISCELLANEOUS (2008)." | Π's Ex. 46, FF # 65. |
| | 100. | On August 23, 2023, the GK Bankruptcy Court entered its order granting the Trustee's motion authorizing closure and consolidation of trust and IOLTA accounts, denying Erika Girardi's opposition in its entirety, and authorizing the Trustee to treat the trust funds as property of the Estate and deposit them into the Estate's operating account. | Π's Ex. 47. Trustee's Motion to Close and Consolidate Trust/IOLTA Accounts filed in *In re Girardi Keesee,* Case No. 20-bk-21022, Dkt. # 1787  Π's Ex. 48. |

| | | Court Order approving Trustee's Motion to Close and Consolidate Trust/IOLTA Accounts filed in *In re Girardi Keesee,* Case No. 20-bk-21022, Dkt. # 1898 |
|---|---|---|

## L. Girard Keese Litigation Funding Credit Facilities

| 101. | On July 5, 2011, Girardi Keese entered into a litigation financing transaction with California Lending II ("CAL II") entered a transaction pursuant to which CAL II provided Girardi Keese with a $3,500,000 litigation funding line of credit with an interest rate of 18% per annum. | Π's Ex. 18, Declaration of Paul Cody ("**Cody Decl.**") filed in Miller v. Counsel Financial Services, et al, Bk. Adv. 2:22-ap-01169-BR, Dkt. 33, Exhibit A. |
|---|---|---|
| 102. | The CAL II financing was increased to $5,000,000 on August 12, 2011. | Id., Exhibit C . |
| 103. | On or around August 1, 2013, CAL II renewed, but did not increase Girardi Keese's funding agreement pursuant to a "Second Amended and Restated Revolving Promissory Note" in the principal amount of $5,000,000. In the concurrently executed "Second Amended and Restated Security Agreement," Girardi Keese granted CAL II a blanket lien on all of its assets, including the attorneys' fee proceeds from all its cases. | Id., Exhibit E. |

| 104. | On or around August 28, 2013, CAL II filed a UCC 3 (designated as Instrument No. 1373755925) to evidence and perfect its security interest in all assets of Girardi Keese. | Id., Exhibit F. |
|---|---|---|
| 105. | On March 31, 2016, Stillwell Madison LLC ("Stillwell") provided Girardi Keese with a $5,110,440.38 loan pursuant to the terms and conditions of a written agreement and security agreement (the "Stillwell Funding Agreement"). Girardi personally guaranteed the Stillwell Funding Agreement. | Π's Exhibit19 Declaration of Jay Holland filed in the case, *Stillwell Madison v. Girardi* Keesee, LASC Case No. 20STCV07853 Π's Exhibit 20, Complaint file |
| 106. | In 2017, Girardi Keese secured additional funding from litigation funder Law Finance Group ("**LFG**") in the approximate amount of $15,000,000 (the "**LFG Funding Agreement**"). The loan was secured by the same collateral as granted to CAL II in 2013 and to Stillwell in 2016. | |
| 107. | On or about July 11, 2017, CAL II renewed and increased its financing to Girardi Keese to $6,000,000 pursuant to a "Third Amended and Restated Revolving Promissory Note" and a "Third Amended and Restated Security Agreement." The security agreement purportedly continued the unlimited blanket security interests in all of the same assets which secured the renewed 2013 loan. At this time, CAL II's "loan" to Girardi Keese had been outstanding since 2011 and had not been repaid in full or in part | Π's Ex. 18, Cody Decl., Exhibit G |
| 108. | By August 28, 2018, the Stillwell loan was in default. | |

| | | |
|---|---|---|
| 109. | At or about the same time Girardi Keese was in default on the LFG Funding Agreement. | |
| 110. | On or around November 8, 2019, GK executed and delivered to CAL II a Fourth Amended and Restated Promissory Note in the amount of $8,000,000. | |

**M.  Christopher Kamon's Arrest and Information charging Kamon with Wire Fraud and Criminal Forfeiture**

| | | |
|---|---|---|
| 111. | On January 19, 2023, the Department of Justice filed an "Information" commencing criminal proceedings against GK CFO Christopher Kamon with wire fraud and criminal forfeiture. *USA v. Christopher Kazuo Kamon,* Cr. No. 2:23-cr-00024-JLS. | Π's Ex. 10. |
| 112. | On January 31, 2023, a federal grand jury in the Central District of California returned an indictment charging Thomas V. Girardi and GK CFO Christopher Kamon with four counts of wire fraud in violation of 18 U.S.C. § 1343, with forfeiture allegations pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), *United States v. Girardi*, Case No. 2:23-cr-00047-JFW ("Indictment"). | Π's Ex. 11. |
| 113. | The indictment alleged that from at least 2010 through December 2020, Girardi and Kamon knowingly and intentionally devised and executed a scheme to defraud GK's clients by misappropriating settlement proceeds entrusted to them and the firm. | Id., at 8:16–24. |
| 114. | The scheme included depositing settlement funds into attorney trust accounts under Girardi and Kamon's control, | Id., at 8–6. |

| | | |
|---|---|---|
| | misappropriating those funds for improper purposes—including firm expenses and American Express charges, including payments for Thomas Girardi and Erika Girardi's American Express personal charges—and concealing the theft through false communications and lulling payments. | |
| 115. | On August 27, 2024, a jury returned a unanimous verdict finding Thomas Girardi guilty on all four counts of wire fraud. | Π's Ex. 12. V Verdict, Dkt. # 387 |
| 116. | On June 3, 2025, the District Court entered judgment sentencing Girardi to 87 months' imprisonment, to be served concurrently. | Π's Ex. 13. Girardi Judgment and Sentencing Order, Dkt. #533 |
| 117. | On October 8, 2024, Kamon entered into a plea agreement, pursuant to which Kamon plead guilty to the one count information in *USA v. Christopher Kazuo Kamon,* Cr. No. 2:23-cr-00024-JLS which charged Kamon with wire fraud in violation of 18 U.S.C. § 1343. As part of his Plea Agreement Kamon admitted to the following facts: | Π's Ex. 14, Kamon Plea Agreement, Dkt. #398. |
| 118. | From in or about 2004 until in or about December 2020, defendant Kamon was head of the accounting department at the law firm Girardi Keese. Girardi Keese was a law firm that was located in Los Angeles, California, | Π's Ex. 14, Kamon Plea Agreement, Dkt. #398, p.l :3-6. |
| 119. | From his position as head of accounting at Girardi Keese, defendant Kamon worked closely with co-defendant Girardi and other senior lawyers at Girardi Keese, supervised its accounting department, and was in charge of facilitating the firm's payment | Π's Ex. 14, Kamon Plea Agreement, Dkt. #398, p.l-2 :8-3. |

of expenses. As head of accounting at Girardi Keese, defendant Kamon had a duty to keep accurate books and records of the firm, including the accounting of monies held in its attorney-client trust accounts. Defendant Kamon had access to, knowledge of the balances, and, at defendant Girardi's direction oversaw various Girardi Keese attorney-client trust accounts, also called an "Interest on Lawyer's Trust Account" or "IOLTA" accounts, at defendant Girardi's direction, including an account at Torrey Pines Bank, bearing an account number ending in 5859 (the "Torrey Pines IOLTA Account"), and an account at Nano Banc, bearing an account number ending in 0567 (the "Nano Banc IOLTA Account"). An IOLTA account is a special kind of trust account. Any interest earned on funds kept in an IOLTA should not be kept by the law firm but should instead be sent to the California State Bar. An IOLTA account is intended as a short-term place wherein settlement money would be deposited and funds promptly would be sent to the respective clients.  Typically, defendant Girardi determined and directed which clients would be paid, how much they would be paid, when they would be paid and signed all outgoing checks to clients.

| | | |
|---|---|---|
| 120. | Defendant Kamon~ had signatory authority on additional bank accounts maintained by Girardi Keese, including two operating accounts, a Torrey Pines Bank account ending in 9821 ("Accciunt 9821") and a Nano Banc account ending in 0096 ("Account 0096"). Defendant Kamon used Account 9821 and | Π's Ex. 14, Kamon Plea Agreement, Dkt. #398, p.2:4-25. |

| | | |
|---|---|---|
| | Account 0096 to pay Girardi Keese's operating expenses, such as payroll, rent, and other day-to-day costs. Generally, defendant Girardi called defendant Kamon each morning and asked for the balances of the Girardi Keese bank accounts, including the IOLTA accounts. Defendant Kamon knew that the trust account should be used to pay clients and draw GK's fees and costs when appropriate. When the Girardi Keese operating accounts were low, defendant Kamon would relay this information to defendant Girardi. Defendant Girardi would then instruct defendant Kamon to transfer money from the Girardi Keese IOLTA accounts to the operating accounts. Defendant Girardi would identify cases to debit the money from and instruct defendant Kamon to identify the withdrawal as "attorney fees" from the cases. If defendant Girardi instructed defendant Kamon to transfer attorney fees from a case in which fees had already been taken, defendant Kamon would so inform defendant Girardi. Defendant Girardi would instruct defendant Kamon to "do it anyways". This was a common practice at Girardi Keese of which other senior lawyers in the firm were aware. | |
| 121. | Beginning at least as early as in or around 2010 and continuing through at least in or around December 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants Girardi and Kamon together with others, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim clients to whom | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 2-3:26-8. |

| | | |
|---|---|---|
| | defendant Girardi and Girardi Keese had agreed to provide legal services as to material matters, and to obtain money and property from such victim clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts. | |
| 122. | In furtherance of the scheme, attorneys at Girardi Keese, including defendant Girardi, would negotiate a settlement on behalf of a client that would require the payment of funds to the client. Defendants Girardi and, at times, others with knowledge would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts, including the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account. Defendant Girardi would thereafter embezzle and misappropriate settlement funds from the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account belonging to Girardi Keese clients for improper purposes. The improper purposes included, among other things, paying other Girardi Keese clients whose own settlement funds had previously been misappropriated, paying Girardi Keese's payroll, and paying other Girardi Keese's expenses, including its American Express Card bills encompassing charges for defendants Girardi and Kamon's personal expenses. | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 3:9-23. |
| 123. | **Embezzlement of Client l's Funds**<br>"Client 1" was an individual who resided in San Bruno, California. Beginning on or about October 1, 2010, defendant Girardi and Girardi Keese had a formal attorney-client | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 3-4:24- |

| | | |
|---|---|---|
| | relationship with | |
| 124. | Client 1. Specifically, defendant Girardi and Girardi Keese agreed to represent Client 1 in connection with a lawsuit against a public utility related to significant injuries Client 1 sustained as a result of an explosion that caused severe burns all over his body. | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 4:1-4. |
| 125. | In or about January 2013, defendant Girardi negotiated a settlement of the lawsuit related to Client l's injuries without obtaining prior approval of the settlement terms from Client 1. The terms of the settlement provided that Client 1 would be paid $53,000,000 to release **all** of Client l's claims. Pursuant to Client l's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 25% of the settlement amount, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese. | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 4:5-12. |
| 126. | As part of the settlement agreement, $25,000,000 were invested in an annuity for the benefit of Client 1. | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 4:13-14. |
| 127. | On or about January 24, 2013, the remaining amount of the settlement, namely, $28,000,000, was wire transferred to the Torrey Pines IOLTA Account. Defendants Girardi and Kamon were provided notice of the incoming wire that same day. Defendant Girardi then misappropriated and embezzled a portion of Client l's settlement funds and caused those funds to be used to pay other expenses and liabilities of Girardi Keese | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 4:15-2 |

| | | |
|---|---|---|
| | unrelated to Client 1, including payments to other Girardi Keese clients whose own settlement funds had previously been misappropriated by defendant Girardi and others. | |
| 128. | In order to lull Client 1 and prevent Client 1 from discovering that defendant Girardi had embezzled Client l's settlement funds, defendant Girardi falsely informed Client 1 that Client l's settlement funds had been transferred into a separate interest-bearing account when, in fact, no such transfers had been made and no such separate interest-bearing account containing Client l's settlement funds existed. | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 4-5:24-3. |
| 129. | Thereafter defendants Girardi and Kamon, aiding and abetting each other, caused to be committed the following acts:<br>   • Sending and causing to be sent lulling payments to Client 1 as purported "interest payments" deriving from the supposed separate interest-bearing account; and<br>   • Sending and causing to be sent, on July 1, 2019, a check for $2,500,000 to Client 1 purportedly as a disbursement of Client l's settlement funds, which funds were, as defendants Girardi and Kamon then knew, settlement proceeds belonging to other Girardi Keese clients, and not Client l's settlement proceeds, which defendant Girardi had already spent and caused to be spent through disbursements unrelated to Client 1. | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 5:4-16. |
| 130. | For the purpose of executing the above-described scheme to defraud, defendants Girardi and Kamon, aiding and abetting each other, transmitted and caused to be transmitted a wire | Π's Ex. 14, Kamon Plea Agreement, Dkt. # 398, p. 5:17-25 |

| | | |
|---|---|---|
| | clearing the above referenced $2,500,000 check drawn on the Nano Banc IOLTA Account and deposited into First Century Bank, in Los Angeles, California, which wire traveled via a server located in Oklahoma City, Oklahoma, for the benefit of Client 1, the source of which funds was, in part, the settlement proceeds belonging to other clients of Girardi Keese. | |

**M. Erika's Willing Participation in Girardi's Attempt to Obtain a California Gaming License Based Upon False and Fraudulent Misrepresentations to the California Gaming Commission**

| | | |
|---|---|---|
| 131. | In or around 2013 approached Erika to obtained a California gaming license in her name. | Π's Ex. 8, Erika Depo. Tr. p. 36:1-21 |
| 132. | Girardi had a Nevada gaming license and was ineligible to obtain a gaming license in her name. | Id., at p. 36:1-21; p. 29:9-10 |
| 133. | Erika made an application for a California Gaming License in 2013 under the penalty of perjury. | Π's Ex. 33, Π's Ex. 8 Erika Depo. Tr. p. 36:1-21; p. 29:9-10 |
| 134. | As part of her application for the California gaming license, Erika submitted a document titled "DECLARATION OF FULL DISCLOSURE" signed under the penalty of perjury. | Π's Ex. 36, |
| 135. | In the DECLARATION OF FULL DISCLOSURE, Erika represented: | Π's Ex. 36 |

| | | | |
|---|---|---|---|
| | | • "Applicant is or will be the sole beneficial owner of all financial interest in the gambling operation or any portion thereof for which applicant is applying."<br><br>• "Applicant has no agreements or understandings with any other person or entity and no present intent to permit anyone to hold as agent nominee or otherwise any direct or indirect interest whatsoever in or to the licensed gambling establishment or any portion thereof for which applicant seeks a finding of suitability license or permit." | |
| 136. | | In her deposition taken on October 19, 2022, Erika testified in relevant part:<br><br>• The way it was explained to me, Tom had a license in Nevada with Boyd Gaming. [Depo. Tr. 36:8-9]<br><br>• There is a law that says if you are an owner or some sort of operator in Vegas, you may not have holdings in California gaming. [Depo. Tr. 36:14-16]<br><br>• He (Tom Girardi) says to me "Erika, I want you to get a gaming license so you can" -- I don't even know what the word would be -- "hold our family's or my interest." [Depo. Tr. 36:18-20]<br><br>• I did ask why he was doing it but I never thought it was illegal. I just -- the way it was explained to me was that it had never been done. [Depo. Tr. 37:7-9] | Π's Ex. 8,<br><br>Erika Depo. Tr. Oct. 19, 2022. |
| 137. | | The Gaming License Forms (i) Application for State Gaming License, (ii) Authorization for Release of Information, (iii) Declaration of Full Disclosure were signed under the penalty of | Π's Ex. 33,<br><br>Π's Ex. 35,<br><br>Π's Ex. 36, |

| | | |
|---|---|---|
| | perjury, were false and fraudulent in that, among other things, Erika listed several properties as being her own separate property when in actuality the properties were held in Girardi's name, or in the name of "G & L Aviation", a partnership between Girardi and attorney Walter Lack. | Π's Ex. 8, Erika Depo. Tr. Oct. 19, 2022, p. 21: 6-8; p.21:9-19. |

**N. Erika's Submission of Fraudulent Tax Returns**

| | | |
|---|---|---|
| 138. | Girardi, using the Debtor's staff, managed the financial affairs of the Girardi family, including the preparation of their tax returns in collaboration with external accountants. | Π's Ex. 2. Answer, p.4 ¶ 5: 5-7 |
| 139. | As the sole owner and member of EJ Global, Erika Jayne consistently reported her income and expenses from EJ Global on Schedule C of her personal income tax returns. | Π's Ex. 25 Expert Report of John J. Menchaca, CPA, ("Menchaca Rpt.") at p. 6, ¶ 30 |
| 140. | The Girardi's joint tax returns do not record the Transfers made on behalf of EJ Global as income. | Π's Ex. 25 Menchaca Rpt., at p. 6, ¶ 30 |
| 141. | Erika signed the tax returns individually and as the managing member of EJ Global from 2008 to 2018. | Π's Ex. 7 Erika Aug. Depo Tr., p. 324:13-18 |
| 142. | "The Transfers to or for the benefit of Erika Girardi and EJ Global, LLC by the Debtor were accomplished in such a manner | Π's Ex. 25 Menchaca Rpt., at p. 6 |

| | | |
|---|---|---|
| that it is reasonable . . . to conclude that the methodology of the payments and the accounting of the transactions was an improper and illegal tax avoidance scheme." | | "Expert Opinion" |

### ERIKA'S RETENTION OF AMEERICAN EXPRESS REIBURSEMENT FOR ALLEGED FRAUDULENT CHARGES.

| | | |
|---|---|---|
| 143. | In the summer of 2016, TVG began to complain to Erika Girardi that she was spending too much on her AMEX card. | Π's Ex. 49, Declaration of Erika Girardi in Support of Defendants' Special Motion to Strike Plaintiff's Complaint Pursuant to Code of Civil Procedure Section 425.16 filed in the case, Christopher Psaila v. Erika Girardi et al., Case No. 2:23-cv-07120-MWF Dkt. # 25-1. |
| 146. | About a month later, TG again complained to EG about supposedly high and excessive Amex charges. | Id. |
| 147. | In September 2016, EG called Amex but could not provide security information because I did not know it. The Amex customer service agent reassured me that she recognized my voice from watching *The Real Housewives of Beverly Hills* and gave me access to the AMEX account. | Id. |
| 148. | On September 19, 2016, EG received an email from AMEX | Id. |

| | | |
|---|---|---|
| | confirming her recent enrollment for online access to my account. | |
| 149. | In November – December 2016 EG became concerned about charges being made by a costume design company "Marco Marco" charges made against EG's AMEX card. | Id. |
| 150. | In December 2016, EG reported her concerns to the Secret Service by getting in touch with Agent Robert Savage, a client of Girardi Keese in an action against Volkswagon who EG met at one or more social events. | Id. |
| 151. | On December 7, 2016 EG with her assistant Laia met with Mr. Savage who introduced her to two investigators, Kenneth Hendeerson and Steve Scarince. | Id. |
| 152. | At the meeting, EG reported circumstance surrounding her belief as to multiple unauthorized charges made against her AMEX card by Marco Marco principle, Christopher Psaila. | Id. |
| 153. | After investigating numerous charges made by Marco Marco against her AMEX card, Mr. Henderson advise EG to contact American Express and that she was working with him and Peter Grimm, an American Express investigator. | Id. |
| 154. | AMEX credited Girardi's personal AMEX account ending in 4-68002, $787,117.88 during January and February 2017 reporting periods. Of this amount AMEX issued a check to Girardi in the amount of $516,755.64. The balance was credited against charges then pending on the credit card account. The check to Girardi in the amount of $516,755.64 was deposited in Girardi and Erika's Joint Account at Torrey Pines Bank, rather turning | Π's Ex. 21<br><br>Deposit Slip Torrey Pines Bank |

| over the check  to Girardi Keese, who actually paid the charges that were subject to the credit. | |
|---|---|

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(a),  and 1334(b) as this is a civil proceeding arising under, arising in, and related to a case under title 11.

2.     The Court also has diversity jurisdiction in that Defendant Erika Girardi is a California resident, Defendant EJ Global, is a California limited liability company, and Defendant Pretty Mess, Inc., is a California corporation.  Plaintiff, LHA Land, LLC is a Colorado limited liability company and its sole member is a resident of the State of Minnesota.

3.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), including subsections (A), (E), (H), and (O).

### B. Judicial Notice and Preclusive Effect of Criminal Conviction

5.     The Court takes judicial notice of the existence and contents of the criminal indictment, jury verdict and criminal judgment entered against Thomas V. Girardi in the case, *U.S.A. v. Thomas Vincent Girardi and Christopher Kazuo Kamon Cr. No. 2:23-cr-00047* pursuant to Fed. R. Evid. 201.

6.     Thomas Girardi's jury conviction and judgment in  *U.S.A v. Thomas Vincent Girardi et al.,* (Plaintiff's Exhibits 12-13] and Christopher Kazuo Kamon's Plea Agreement in the case *U.S.A. v. Christopher Kazoo Kamon,* Cr. Nos: 23-00024-JLS-1, 23-00047-JLS-2, establishes that Girardi knowingly and intentionally engaged in a scheme to defraud clients of Girardi Keese and that Girardi used client trust funds and GK general account funds to pay Erika Girardi's personal American Express card

charges. [Plaintiff's Exs. 11-14]

5.     The issues of Girardi's intent, knowledge, and fraudulent conduct and transfers were actually litigated, necessarily decided, and resolved by a final judgment entered under a higher burden of proof.

6.     In the Ninth Circuit, such convictions—whether by verdict or guilty plea—are given preclusive effect in establishing the debtor's fraudulent intent in subsequent civil and bankruptcy proceedings. *Rosen v. Neilson (In re Slatkin), 2004 U.S. Dist. LEXIS 10555* (C.D. Cal. 2004);  aff'd, *Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin),* 525 F.3d 805, 811-812.

**C. GK and Girardi were Erika's Agents and Erika's Imputed Knowledge**

7.     Erika gave Girardi and GK extensive control over her and EJ Global finances.  Over the years GK, through Girardi, made numerous transfer for Erika and EJ Global's benefit. As a result any reasonable principal in Erika's position would clearly desire to have Girardi and GK's knowledge that GK was being operated as a criminal enterprise. Restatement (Third) of Agency § 5.03 (2006) ("Notice of a fact that an agent knows or has reason to know is imputed to the principal.") As a result, imputing Girardi and GK's knowledge to Erika prevents her from taking the benefit of the good-faith defense. See, e.g., *In re IFS Fin. Corp.*, 417 B.R. 419, 444 (Bankr. S.D. Tex. 2009) (finding that principal "should have known" of fraudulent activity through imputation of knowledge from agent such that principal did not have good faith defense).

**D. Erika Imputed Knowledge Precludes Erika from Asserting Good Faith and Reasonably Equivalent Value**

8.     Erika Girardi was, at all relevant times, the spouse of Girardi Keese's managing partner and thus a statutory insider of Girardi Keese. 11 U.S.C. § 101(31); *In re Beverly,* 551 F.3d 1092, 1101 (9th Cir. 2008).

9.     Transfers made for the benefit of an insider are subject to heightened scrutiny, and courts routinely find that such transfers lack reasonably equivalent value

where they confer personal benefit on the insider rather than value to the debtor. *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008).

10. Erika Girardi admitted that Girardi Keese managed her personal finances and those of EJ Global, paid her American Express account monthly, maintained all financial records, and prepared her tax returns.

11. These admissions establish an agency relationship as a matter of law. "*Imperial Fin. Corp. v. Fin. Factors, Ltd.*, 53 Haw. 203, 206, 490 P.2d 662, 664 (1971) (citing Restatement (Second) of Agency § 281 (1958)) ("the knowledge of an agent which he is under a duty to disclose to his principal or to another agent of the principal, is to be imputed to the principal.")

12. Accordingly, Girardi Keese's knowledge of its own insolvency, misuse of client trust funds, and lack of any enforceable repayment obligation is imputed to Erika Girardi and to EJ Global, her wholly owned entity. Defendants therefore cannot plausibly assert that they received the Transfers in good faith or without knowledge of the Debtor's financial condition. *In re Agricultural Research & Tech. Group, Inc.,* 916 F.2d 528, 535–36 (9th Cir. 1990) (good faith absent where transferee knew or should have known of debtor's insolvency or fraudulent purpose).

13. Notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal. Restatement (Third) of Agency § 5.03 (2006).

14. An agent's duty to disclose information to the principal includes any information that is "relevant to affairs entrusted to [the agent] and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." *Imperial Fin. Corp.,* 53 Haw. at 205, 490 P.2d at 664 (quoting Restatement (Second) Agency § 381).

15. Additionally, where a transfer is made for the benefit of an insider, the debtor does not receive value merely because the insider's affiliated entity is nominally

charged with repayment. The Ninth Circuit has rejected attempts to manufacture value through insider bookkeeping entries where the economic reality is a diversion of assets for personal use. *In re Walldesign, Inc.*, 872 F.3d 954, 961 (9th Cir. 2017).

16.     The Ninth Circuit holds that transfers made in furtherance of a fraudulent scheme provide no reasonably equivalent value as a matter of law. I*n re United Energy Corp.*, 944 F.2d 589, 595–96 (9th Cir. 1991); *In re Agricultural Research & Tech. Group, Inc.,* 916 F.2d 528, 535–36 (9th Cir. 1990). Allowing such evidence would mislead the jury and waste trial time.

17.     Erika gave Girardi and GK extensive control over her and EJ Global finances.  Over the years GK, through Girardi, made numerous transfer for Erika and EJ Global's benefit. As a result any reasonable principal in Erika's position would clearly desire to have Girardi and GK's knowledge that GK was being operated as a criminal enterprise. Restatement (Third) of Agency § 5.03 (2006) ("Notice of a fact that an agent knows or has reason to know is imputed to the principal.") As a result, imputing Girardi and GK's knowledge to Erika prevents her from taking benefit of the good-faith defense. See, e.g., *In re IFS Fin. Corp.,* 417 B.R. 419, 444 (Bankr. S.D. Tex. 2009) (finding that principal "should have known" of fraudulent activity through imputation of knowledge from agent such that principal did not have good faith defense).

18.

**E.  Actual Fraudulent Transfers — 11 U.S.C. § 548(a)(1)(A)**

20.     Under 11 U.S.C. § 548(a)(1)(A), the Trustee  (now LHA) may avoid a transfer of an interest of the debtor in property made with actual intent to hinder, delay, or defraud creditors.

21.     The Transfers at issue constituted transfers of property of the debtor.

22.     The Transfers were made for the benefit of Erika Girardi, individually and as the sole member of EJ Global.

23.     The Transfers were made pursuant to and in furtherance of Thomas

Girardi's fraudulent scheme established by Girardi's Guilty Verdict and Kamon's Plea Agreement. *Rosen v. Neilson (In re Slatkin), 2004 U.S. Dist. LEXIS 10555* (C.D. Cal. 2004);  aff'd, *Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin),* 525 F.3d 805, 811-812.

24.    Actual fraudulent intent may be inferred from the totality of the circumstances, including the commingling of trust funds, concealment, lack of documentation, insider benefit, and criminal fraud.

25.    LHA has established actual intent to hinder, delay, or defraud creditors given Girardi's commingling of trust funds, concealment, lack of documentation, insider benefit, and criminal fraud.

20.    The Transfers  made on behalf of the Defendants are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

**F. Constructive Fraudulent Transfers — 11 U.S.C. § 548(a)(1)(B)**

27.    Under 11 U.S.C. § 548(a)(1)(B), a transfer is avoidable if the debtor received less than reasonably equivalent value and was insolvent or rendered insolvent.

28.    The debtor did not receive reasonably equivalent value in exchange for the Transfers.

29.    The Transfers satisfied personal expenses of Erika Girardi and business expenses of EJ Global, neither of which provided value to the debtor.

30.    At the time of the Transfers, the debtor was insolvent in light of the massive fraud perpetrator by Girardi and Kamon as a result of which Girardi Keese was unable to pay its client creditors from the proceeds received for their individual cases, and instead were paid from the proceeds of other clients much akin to a Ponzi Scheme.

31.    The Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

**G. Fraudulent Transfers Under 11 U.S.C. § 544(b) and California Law**

32.    Pursuant to 11 U.S.C. § 544(b), the LHA may avoid any transfer voidable under applicable state law by an unsecured creditor.

33.    California's Uniform Voidable Transactions Act, Cal. Civ. Code §§ 3439.04 and 3439.05, applies.

34.    The Transfers were made with actual intent to hinder, delay, or defraud creditors within the meaning of Cal. Civ. Code § 3439.04(a)(1).

35.    Alternatively, the Transfers were made without reasonably equivalent value while the debtor was insolvent within the meaning of Cal. Civ. Code § 3439.05.

36.    The Transfers are avoidable under 11 U.S.C. § 544(b).

**H. Recovery of Avoided Transfers — 11 U.S.C. § 550**

37.    Under 11 U.S.C. § 550(a), LHA  may recover avoided transfers from the initial transferee or the entity for whose benefit the transfer was made.

38.    Erika Girardi was the individual  for whose benefit the Transfers were made.

39.    Erika Girardi is liable to the Plaintiff for the value of the Transfers made for her benefit.

40.    EJ Global was an entity or whose benefit the transfer was made.

41.    EJ Global is liable to the Plaintiff for the value of the Transfers made for her benefit

**I. Constructive Trust [Plaintiff's 5th Claim for Relief]**

A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1485 (2014). The essence of the theory of constructive trust is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing. *Id.* The principal circumstances where constructive trusts are imposed are set forth in Civil Code sections 2223 and 2224. Section 2223 provides that '[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner.' Section 2224 states that '[o]ne who gains a thing by fraud, accident, mistake, undue influence, the

violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.' Under these statutes and the case law applying them, constructive trust may be imposed where the following three conditions are satisfied:

(1) the existence of a *res* (property or some interest in property);

(2) the *right* of a complaining party to the res; and,

(3) some *wrongful* acquisition or detention of the res by another party who is not entitled to it." *Communist Party v. 522 Valencia, Inc*. 35 Cal. App. 4th 980, 990 (1995)

"[A] constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled." *Weiss v. Marcus*, 51 Cal. App. 3d 590, 600 (1975). California law permits imposition of a constructive trust on traceable proceeds, even where funds pass through intermediate accounts or are commingled. *Brodie* v. *Barnes* 56 Cal.App.2d 315, 321-323 (1942); *Haskel Engineering & Supply Co.* v. *Hartford Acc. & Indem. Co*. 78 Cal.App.3d 371, 375 (1978). A constructive trust may be imposed against non-fiduciary recipients who receive trust property without giving value, even if they did not personally commit the underlying fraud. *Id.*

Here, Erika Girardi and EJ Global received the benefit of Girardi's massive fraudulent scheme when Girardi Keese paid Erika Girardi's American Express card charges for which she purchased clothes, jewelry, shoes, etc. EJ Global received the benefit of Girardi's fraud by having all its vendors claim by Girardi Keese during the time of Girardi was misappropriating millions of dollars of client trust funds and then used those funds to pay both American Express charges and vendor claims.

Neither Erika Girardi nor EJ Global provided no value for the payments made on their behalf. It is of no import that Erika Girardi may or may not have participated the Girardi fraud. *Haskel Engineering & Supply Co.* v. *Hartford Acc. & Indem. Co*. 78 Cal.App.3d 371, 375 (1978). Misappropriation of trust funds, concealment, false

representations, and diversion for personal or firm expenses constitute textbook constructive trust misconduct. The following facts compel imposition of a constructive trust:

1. Payments were not arms-length compensation but gratuitous transfers Funded by client trust money.

2. As Girardi's spouse and beneficiary of firm-paid expenses, Erika Girardi stood in a position of insider benefit.

3. Client settlement funds were stolen from vulnerable victims.

4. The funds were diverted to personal and entertainment expenditures, not earned compensation.

5. Without a constructive trust, Erika Girardi and EJ Global would retain benefits derived from criminally misappropriated trust property.

6. Monetary damages alone are inadequate where funds are traceable and equitable ownership lies with the victims, in this case the creditors of Girardi Keese.

The Plaintiff is entitled to seek a constructive trust:

1. As the successor to the rights of creditors and victims;

2. To recover trust property wrongfully diverted prepetition; and

3. To prevent unjust enrichment of Erika Girardi and EJ Global.

Imposition of a constructive trust here is consistent with bankruptcy policy, as it enforces pre-existing property rights rather than creating new ones.

Accordingly, a constructive trust should be imposed upon the benefits Erika Girardi and EJ Global received from the fraudulent conveyances made on their behalf.

**J. Fourteenth Claim for Relief - Unjust Enrichment.**

A claim for unjust enrichment requires a plaintiff to plead two elements: "receipt of a benefit and unjust retention of the benefit at the expense of another." *Pinel v. Aurora Loan Servs., LLC, 814 F. Supp. 2d 930, 944 (citing Peterson v. Cellco P'ship, 164 Cal.App.4th 1583, 1593, (2008))*. The benefits must generally be 'conferred by mistake,

fraud, coercion, or request; otherwise, though there is enrichment, it is not unjust.'" *Kelleher v. Kelleher*, 2014 U.S. Dist. LEXIS 2773, 2014 WL 94197, at *7 (N.D.Cal. Jan. 9, 2014) (citing *Nibbi Bros., Inc. v. Home Fed. Sav. & Loan Ass'n*, 205 Cal. App. 3d 1415, 1422, 253 Cal. Rptr. 289 (1988)).

Unjust enrichment occurs only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it. *Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726 (2000).

To prevail on a claim for relief pursuant to §3439.04(a)(2)(B) it must be established that the Transfers were made without reasonable equivalent value and the Debtor intended to incur or believed or reasonably should have believed that the Debtor would incur, debts beyond the debtor's ability to pay as they became due.

The evidence establishes overwhelming receipt of benefits:

1. Girardi Keese paid over $25 million in American Express charges and invoices for the benefit of Erika Girardi and EJ Global.

2. EJ Global was formed without capital, lacked independent business operations, and relied entirely on Girardi Keese funding.

3. Expenses included:

    i. Personal charges incurred by Erika Girardi;

    ii. Entertainment, promotion, and lifestyle expenses;

    iii. EJ Global operating costs paid directly by Girardi Keese.

    iv. Expert analysis confirms no value was provided by Erika Girardi or EJ Global in exchange.

These payments constitute direct, measurable economic benefits. Unjust enrichment requires that the benefit be obtained at another's expense, not merely that the defendant benefitted. Here:

1. The funds used to pay Erika Girardi and EJ Global were misappropriated client settlement proceeds held in IOLTA trust accounts.

2. Those funds belonged to clients and creditors, not Girardi Keese.

3. The diversion of trust funds created a shortfall that:

    i. Prevented clients from receiving settlement proceeds;

    ii. Forced Girardi Keese to misuse later client funds to cover prior thefts;

    iii. Ultimately harmed the bankruptcy estate and its creditors.

Thus, the enrichment of Erika Girardi and EJ Global was directly correlated to the depletion of trust assets owed to others.

Retention of a benefit is unjust where it is:

1. Obtained through breach of fiduciary duty;

2. Funded by misappropriated trust property; or

3. Received without consideration under inequitable circumstances.

Here, retention is unjust for multiple independent reasons:

1. No consideration: Erika Girardi and EJ Global provided no services or value commensurate with the payments.

2. The funds originated from client IOLTA accounts.

3. Erika Girardi was Girardi's spouse and EJ Global was created and controlled for her benefit.

4. The payments were part of a long-running scheme resulting in criminal convictions.

California courts consistently hold that recipients of misappropriated funds may be required to disgorge them, regardless of personal wrongdoing. *Lucky Auto Supply* v. *Turner* 244 Cal.App.2d 872, 885 (1966).

Even assuming arguendo that Erika Girardi did not personally orchestrate the underlying fraud, unjust enrichment does not require culpability. Here,

1. Erika Girardi knowingly accepted firm-paid personal expenses.

2. EJ Global operated as a non-arm's-length recipient of firm funds.

3. The payments replaced what otherwise would have required personal or

business funding.

4. The scale and duration of the payments negate any claim of inadvertence or isolated error.

The evidence establishes that:

1. Erika Girardi and EJ Global received tens of millions of dollars in benefits;

2. Those benefits were funded by misappropriated client trust funds;

3. No value was provided in exchange; and

4. Retention of those benefits would be inequitable and unjust.

Accordingly, the Trustee is entitled to restitution and disgorgement of all amounts by which Erika Girardi and EJ Global were unjustly enriched.

**J. Alter-Ego Liability of Erika for the Transfers Made on Behalf EJ Global.**

The elements for alter ego liability are: (i) unity of interest, and alter ego liability necessary to avoid inequitable result. *Automotriz del Golfo de California v. Resnick* , 47 Cal.2d 792, 796 (1957). Factors that lend to alter ego liability include the commingling of corporate funds, failure to observe corporate formalities including maintaining minutes and failure to contribute sufficient capital. *Mid-Century Ins. Co. v. Gardner*, 9 Cal.App.4th 1205, 1212-1213(1992. Where injustice would result but for the finding of alter ego liability, courts tend to find for piercing the veil. *Mesler v. Bragg Management done." Mesler, supra, 39 Cal.3d at 301.*

The evidence overwhelmingly establishes that EJ Global had no separate existence from Erika Girardi and functioned solely as her alter ego.

1. Undercapitalization

i. EJ Global was formed without any capital.

ii. It never operated as a financially independent enterprise.

iii. All expenses were paid directly by Girardi Keese.

2. Failure to Observe Corporate Formalities

Erika Girardi admitted that:

i. There was no minute book.

ii. There were no records of contracts or business activity.

iii. There was no independent accounting as EJ Global's bookkeeping has performed by Girardi Keese personnel.

iv. There is no evidence of board meetings, resolutions, or corporate governance.

3. Commingling of Funds and Assets

i. EJ Global did not pay its own expenses.

ii. Girardi Keese paid EJ Global invoices and Erika's personal American Express charges.

iii. EJ Global functioned as a pass-through for payments funded by misappropriated trust assets.

4. Use of Corporate Entity for Personal Purposes

i. EJ Global existed to fund Erika Girardi's entertainment career and lifestyle.

ii. Corporate expenses overlapped with personal expenses.

5. Exclusive Control and Domination

i. Erika Girardi was the sole beneficiary of EJ Global.

ii. Girardi orchestrated EJ Global's funding and financial operations.

iii. EJ Global had no independent decision-making authority.

6. Unity of Interest Between Girardi Keese, Girardi, and EJ Global

The evidence further shows that Girardi Keese itself functioned as the funding mechanism for EJ Global, collapsing the distinction among:

i. Girardi (individual);

ii. Girardi Keese (law firm); and

iii. EJ Global (purported service company).

Key facts include:

i. Client trust funds were routinely transferred to operating accounts at Girardi's direction.

ii. Those operating accounts paid Erika's and EJ Global's expenses.

iii. EJ Global's survival depended entirely on Girardi Keese's misuse of client trust funds.

7. Inequitable Result if Corporate Separateness Is Respected

The second prong—inequitable result—is plainly satisfied. Absent alter-ego:

i. Erika Girardi would retain millions of dollars in benefits funded by stolen client trust money.

ii. EJ Global would operate as a liability shield for gratuitous transfers.

iii. Victims and creditors would be denied recovery while insiders retain the proceeds of fraud.

Here, inequity is not speculative:

i. Girardi was criminally convicted of wire fraud.

ii. The fraud involved systematic theft of client trust funds.

iii. EJ Global functioned as a downstream recipient of those funds.

iv. The corporate form was used to launder and disguise personal expenditures.

As there existed a complete unity of interest between Erika Girardi and EJ Global, marked by systematic commingling of funds, chronic undercapitalization, and the use of EJ Global as a vehicle to receive and benefit from misappropriated client trust funds, and because a severe inequity would result if the corporate form were respected, equity requires that EJ Global be deemed the alter ego of Erika Girardi. Accordingly, Erika Girardi must be held liable for obligations arising from the misuse of Girardi Keese client trust funds, including restitution, and avoidance-based relief.

[*Signatures on following page.*]

DATED:  May 18, 2026                    JENKINS MULLIGAN & GABRIEL, LLP


By:_____

       Larry W. Gabriel

DATED:  May 18, 2026                    BEALKE LAW


By:_____

       Bruce Bealke [*Pro Hac Vie*]

Attorneys for Plaintiff-assignee, LHA LAND, LLC

**PROOF OF SERVICE**

*Miller v. Erika Girardi et al.,*

**C.D. Case No. 2:25-cv-01038-AH**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is: 5743 Corsa Avenue, Suite 110, Westlake Village, California 91362.

On May 18 , 2026 I served true copies of the following document(s) described as: **PLAINTIFF-ASSIGNEES REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE PLAINTIFF'S CLAIMS FOR (1) CONSTRUCTIVE TRUST (FIFTH CLAIM FOR RELIEF) AND UNJUST ENRICHMENT (FOURTEENTH CLAIM FOR RELIEF). [PROPOSED]**

on

EVAN C. BORGES,
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1700
Costa Mesa, CA 92626
EBorges@GGTrialLaw.com

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail.

**Additional Service**

AH Chambers <AH_Chambers@cacd.uscourts.gov>
Hon. Anne Hwang Courtroom 9C, 9th Floor
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that I am a member of the bar of this Court.

Executed this the   18th   day of May, 2026.

Larry W. Gabriel

Larry W. Gabriel